John J. **TOBOROWSKI**

v.

Robert **FINCH**, Secretary of Health, Education and Welfare.

Civ. A. No. 70–520.

United States District Court,
E. D. Pennsylvania.

Sept. 10, 1973.

Frank J. Toole, Sr., Shenandoah, Pa., for plaintiff.

G. J. Scutti, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## OPINION

TROUTMAN, District Judge.

This action is brought under Section 205(g) of the Social Security Act, 42 U. S.C. § 405(g), to review a final decision of the Secretary of Health, Education and Welfare. The final decision in this case is that of the Appeals Council rendered on December 19, 1969, after granting the plaintiff's request for review of a decision rendered by a hearing examiner on May 12, 1969, and after consideration of additional evidence. The final decision holds that the plaintiff is not entitled to benefits under Section 216(i) and Section 223, respectively, of the Social Security Act, as amended, 42 U.S.C. § 416(i) and § 423.

The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. 42 U. S.C. § 405(g). This Court has no authority to hear the case *de novo*. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964); Mauldin v. Celebrezze, 260 F. Supp. 287 (D.S.C.1966). The question here involved, therefore, is whether there is substantial evidence to support the Secretary's decision. To answer this question, it is the duty of this Court to look at the record as a whole. Boyd v. Folsom, 257 F.2d 778 (3d Cir. 1958); Klimaszewski v. Flemming, 176 F.Supp. 927 (E.D.Pa.1959).

The test for disability consists principally of two parts: (1) a determination of the extent of the physical or mental impairment and (2) a determination whether that impairment results in an inability to engage in substantial gainful activity. Stancavage v. Cele-

brezze, 323 F.2d 373 (3d Cir. 1963); Klimaszewski v. Flemming, *supra*, 176 F.Supp. at page 931.

"Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion". Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L. Ed.2d 131 (1966); Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). It must be enough, if the trial were to a jury, to justify a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. If there is only a slight preponderance of the evidence on one side or the other, the Secretary's finding should be affirmed. Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962).

There are four elements of proof to be considered in making a finding as to plaintiff's ability or inability to engage in any substantial gainful activity. They are: (1) medical data and findings, (2) expert medical opinions, (3) subjective complaints, and (4) plaintiff's age, educational background, and work history. Dillon v. Celebrezze, 345 F.2d 753, 755 (4th Cir. 1965); Thomas v. Celebrezze, *supra*, 331 F.2d at 545; Underwood v. Ribicoff, *supra*, 298 F.2d at 851.

Plaintiff is the recipient of occupational disease and black lung benefits. This, however, is not conclusive upon the Secretary. Jesse Davis v. Richardson, 345 F.Supp. 1273, 1278.

We have carefully reviewed the entire record, including extensive medical testimony and reports by various physicians. The Appeals Council has summarized the evidence as follows (pp. 6 and 7):

### "SUMMARY OF THE EVIDENCE

"A brief review of the medical evidence of record before the hearing examiner reveals that the claimant had a chest X-ray on August 7, 1967, which indicated the possibility of early pneumoconiosis, but there was no evidence of any acute or active pulmonary infection. A complete internist examination in January 1968 resulted in a diagnosis of early hypertensive syndrome with some arteriosclerotic involvement, left ventricular enlargement, a cardiac classification of 11B, and slight lower lobe bronchiectasis based on ventilatory studies and X-rays. The internist stated that it was his overall impression that any dyspnea encountered by the claimant was most likely related to circulatory stress rather than pulmonary inadequacy.

"Another internist examination in July 1968 revealed a diagnosis of pneumoconiosis from history. The physician stated that the claimant had no significant findings on physical examination and that laboratory studies were all within normal limits.

"A Board-certified internist with a subspecialty in cardiovascular diseases, was asked to complete a medical questionnaire after examining the medical evidence of record. He indicated that there was no objective evidence of anthracosilicosis or emphysema, and that the claimant's complaint of shortness of breath and coughing represented several symptoms based on bronchial disease. He stated that the objective findings indicated that the severity of his condition was mild, the prognosis was good for present status, and limitations or restrictions would involve ordinary activity not entailing severe strain, lifting or prolonged walking.

The claimant's personal physician testified at the hearing on April 15, 1969, that he had treated the claimant for almost 5 years for severe anthracosilicosis and bilateral pulmonary emphysema.

In order to determine the functional limitations imposed by the claimant's pulmonary impairment, a special examination was arranged for him at government expense. This was con-

ducted by Dr. H. L. Auerbach, a Board-certified internist, with a subspeciality in cardiovascular diseases, and his report is dated October 11, 1969. The physical examination revealed that the claimant was well developed, well nourished and did not appear acutely or chronically ill. The chest was normal and the lungs were clear to inspection, palpation, percussion and auscultation, although forced expiration did induce some wheezing in the mid-posterior chest. The rest of the physical examination was essentially normal. In regard to ventilatory studies, Dr. Auerbach indicated that on the normal spirographic tracing, both before and after bronchodilators, there was some evidence of air trapping after a single deep expiration. He stated that these findings are consistent with a minimal degree of pulmonary emphysema, without any functional impairment, and he reported that the ventilatory studies were essentially normal. Blood gas studies were conducted by a Dr. Edward P. Swartz, who reported normal blood gases before and after exercise. A chest X-ray revealed some slight widening of the interspaces in the lower chest and slight diffuse increase and accentuation of pulmonary markings. These findings were consistent with slight uncoiling of the aorta, slight diffuse pulmonary fibrosis (consistent with first stage anthracosilicosis) and minimal emphysema. Dr. Auerbach reported no evidence of bronchiectasis. "Dr. Auerbach reported a diagnosis of pulmonary fibrosis and emphysema due to anthracosilicosis. In addition he stated that:

" 'The objective findings of all of the various studies done in this man do not reveal evidence of a significant loss of function due to the lung disease with which he suffers. There is some evidence that he has emphysema and fibrosis, which interferes somewhat with his functional capacity. The ventilatory studies indicate that his capacity to exchange air is normal. The arterial blood gas studies show that he is able to exchange air between his lungs and his circulation. The carbon monoxide test indicates that there is no significant alveolar capillary block. The various exercise tolerance tests which have been done by two observers are essentially normal. The present physical examination also shows no clinical evidence of emphysema, indicating that that demonstrated on X-ray is indeed of minimal degree; he does have some wheezing on forced expiration, and he does have slight evidence of air trapping on the spirogram, both of which are consistent with each other, and with the fact that there is some decrease in his function due to lung disease. Nevertheless, there is nothing whatever in any of these studies to indicate that he has a *total medical impairment*. I cannot find any evidence of bronchiectasis, either by history or by examination, nor on the X-ray.

" 'On the basis of the studies provided, it is my opinion that Mr. Toborowski can do work which does not require hard physical activity, or competitive effort. He is able to engage in all the ordinary activities of daily life, and on the basis of the alternatives you provided, I would say that he can perform medium activity on a sustained basis' (Exh. AC–1)."

It will be noted that the testimony of the plaintiff's personal or attending physician was thus summarized in one brief paragraph (p. 6):

"The claimant's personal physician testified at the hearing on April 15, 1969, that he had treated the claimant for almost 5 years for severe anthracosilicosis and bilateral pulmonary emphysema."

Turning then to an "Evaluation of the Evidence", the Council referred to the testimony of the vocational expert as follows (p. 9):

" * * * A vocational expert testified at the hearing that the claimant could engage in work as a light fix-

ture assembler, assembly machine operator, punch press operator, electrical light fixture tester, inspector, hand packager, and general factory worker, doing unskilled light machine work."

Based upon the testimony of the vocational expert as thus described, the Council concluded as follows in the next succeeding sentence (p. 9):

"The evidence of record has failed to establish a cardiovascular or pulmonary impairment, or any combination of impairments, which would prevent the claimant from engaging in the aforementioned work activity."

However, the record discloses that the brief and incomplete reference to the testimony of the attending physician and the incomplete summarization of the findings of the vocational expert has served to suppress or ignore, without explanation, the very key to the plaintiff's ability or inability to engage in substantial gainful activity.[1]

Reference to the testimony taken before the Hearing Examiner on April 15, 1969, discloses that the plaintiff last worked in 1966, when he became sick, placed himself under the care of Dr. Mika and has "been sick ever since" (p. 30). He cannot walk a mile, cannot drive a car, is unmarried, lives with his mother, plays some cards and watches T.V. (pp. 31 and 32). He does no house work, no cleaning, no painting, no grass cutting or other chores (p. 34). This situation has apparently prevailed since 1966.

Following the plaintiff's testimony Dr. Edward H. Silverman, a psychologist and vocational expert, testified, upon the basis of his study of the record, that *if* the plaintiff has "a silicosis condition or a shortness of breath" (p. 36), he can perform the following work or fill the following positions (p. 37):

"A. Yes. I think he could work as a light fixture assembler. He could work as an assembly machine operator, as a punch press operator, which is light work. He could work as a hand packager, as an electrical or I should change that to light fixture tester and inspector. He could work as a pen and pencil inspector and as a general factory worker performing unskilled light bench work and light machine operation.

Q. That's your vocational evaluation?

A. Yes.

Q. Are these jobs available in the region where he lives?

A. These jobs are all available in the local area; some with greater frequency than others.

Q. Would the fact that he has a chest condition and finds it difficult to breathe would it in any way influence his ability to seek and obtain these positions?

A. Not the mere fact that he has the disability. If the disability were severe enough, it may in some instances. People with anthracosilicosis have worked in occupations in this area and the occupations that I mentioned are available in some companies in the area which do not give physical examinations."

These conclusions were based upon the record as it existed at the moment Dr. Silverman testified. Then followed immediately the testimony of the attending physician, Dr. Mika. He stated that the plaintiff had been regularly under his care for "almost five years", that by reason of anthracosilicosis and bilateral pulmonary emphysema, plaintiff suffers "frequent and severe upper respiratory infections and chest congestions" (p. 38). Plaintiff also suffers "recurrent fevers, chest pain and cough" (pp. 38

---

1. The defendant has conceded that plaintiff meets the special insured status requirements of the Act through December 31, 1971, and that plaintiff must establish that his disability began prior to December 19, 1969. (See page 2 of defendant's brief in support of motion for summary judgment.)

and 39). He stated that the plaintiff always "comes to me when he is sick" and always presents "findings of chest congestion". The constant recurrence of such condition was demonstrated by the fact that reference to Dr. Mika's records disclosed twenty-one visitations in 1968 (p. 40). On certain of these occasions the plaintiff, in addition to "fever and chest congestion" suffered "rales", an indication of "bronchial pneumonia" (p. 41). He explained that there is no "psychological overlay" because "nerves don't bring on fever" (pp. 41 and 42). He does not consider the plaintiff able to walk as much as five blocks (p. 44) and in connection with examination as to the opinions of other examining physicians, who examined the plaintiff on only one occasion, he significantly emphasized that "these men make no mention that they have asked this man (the plaintiff) how many days he was sick in the last year" (p. 44).

Dr. Mika, the attending physician, was then examined as to the findings of the vocational expert, Dr. Silverman. We quote from the record (p. 45):

"Q. Now, the vocational expert, Dr. Silverman, here, tells me that with the disabilities as reported by the claimant, himself, today, that he could do light fixture assembly work. In other words, work of a light and sedentary nature. He could be an assembly machine operator. He could be a punch press operator. He could be a hand packager. Do you agree or disagree with those findings, doctor?

A. Yes, I disagree with him on the basis that I think the man *could not put in a good percentage of days in attendance at work. I feel he would miss half the days in the winter time.* It has been my experience the *last three years* that this is the case, that he has *been sick more than he has been well in the winter time, and no one wants an employee who is not reliable.*

Q. Do you feel that he could not be depended on to do a regular job by coming in every day however light and sedentary the work?

A. I don't think he could even be a ticket collector. I don't think he could even do that. *He would miss the work by not attending.*

Q. I have no further questions. Is there anything else you want to add?

A. No sir, that's about it." (Emphasis ours)

Dr. Silverman, listening to Dr. Mika's testimony, was then recalled and qualified or otherwise reversed his prior testimony as follows (p. 46):

"Q. I don't have any other evidence. Do you want to make any further comments, Dr. Silverman?

DR. SILVERMAN: I might add, with the additional statements by Dr. Mika that he gave, that this would clarify the differentiation I made earlier that *it would depend on the severity of the condition. If he has difficulty in maintaining employment then this would interfere with any kind of employment in the area and not necessarily in those particular occupational titles, sir.*

Q. If he had difficulty in maintaining employment, then what?

A. I should say maintaining attendance at work. *He would have trouble maintaining any kind of factory job regardless of whether he could do the job while he was there.*

Q. What is your conclusion?

A. *I would conclude* on the basis of Dr. Mika's information that *he would have a difficult time holding employment* but could do work while he was there and of the natures that I have described." (Emphasis ours)

In reaching its conclusion, the Appeals Council made no reference to either the testimony of Dr. Mika or the testimony of Dr. Silverman, hereinbefore quoted. Neither did it refer, in the least, to the following testimony of Dr. Mika, called in conclusion of the hearing of April 15,

1969, indicating the need for constant medication (p. 47):

"DR. MIKA: I put him on antibiotics either terramycin or inspectorants. This is usually potassium hydroxyl or benzedrine inspectorant. If he is exceptionally dyspneic, I'll put him on a bronchodilator such as tedral but that is rarely necessary.

Q. How often does this happen in a given year?

A. With the tedral? That is usually all winter. That would be from November till about March. I have had him for two winters.

Q. Excuse me, November till March on bronchodilator?

A. The others are usually when necessary, about a week at a time when he has infectional congestion. I've tried him for two successive winters on a long acting sulphate. I tried a bacterial vaccine made by Lily trying to desensitize him but that didn't work.

Q. That's with regard to the bronchial condition?

A. Yes, sir."

Significantly, the history of the plaintiff's constantly recurring illness precluding *regular* employment in any capacity became a matter of record for the first time on April 15, 1969. It was either ignored or rejected, without explanation, by the Appeals Council. On the contrary, the Council predicated its decision upon the findings of physicians who apparently knew nothing of the history related by Dr. Mika and all of whom, save one, examined the plaintiff or the record on only one occasion *prior* to the recording of this significant history on April 15, 1969. For example, Dr. Mulligan made X-ray studies only on August 7, 1967 (p. 72); Dr. Moll examined on January 28, 1968 (p. 79); Dr. Corazza examined on July 23, 1968 (p. 88); Dr. Sodeman did not examine the plaintiff, but answered certain questions based upon the record as it existed on March 28, 1969 (p. 111). The lone ex-

ception is Dr. Auerbach who examined the plaintiff on October 11, 1969 (p. 113). However, a reference to the history obtained by him reveals no reference to the history detailed by Dr. Mika. He found "pulmonary fibrosis and emphysema due to anthracosilicosis" (p. 115) which condition, he suggested, would "probably progressively deteriorate" (p. 116). Even absent the history related by Dr. Mika, he found the plaintiff able to perform only "medium activity on a sustained basis" (pp. 115, 116).

Given the history related by Dr. Mika, and uncontradicted in this record, performance of a substantial gainful activity on a "sustained basis" becomes a practical impossibility. Substantial gainful activity, no matter how sedentary, presupposes the ability to report for duty with that regularity and perform such duties with that continuity and lack of interruption reasonably required by an employer. This, the plaintiff cannot do on the basis of Dr. Mika's uncontradicted history and opinion. This fact was recognized and this conclusion reached by the vocational expert (p. 46).

We have searched the record for some indication as to the reason for the rejection of the uncontradicted testimony of Dr. Mika. We find none in the decision of the Appeals Council. However, in the Examiner's decision, we find the statement " * * * most controlling on the question of severity, must be the opinions set forth by Dr. Sodeman" (p. 20). For this we find no basis in the record. His suggestion, as found by the Examiner, that the plaintiff's condition is "mild" and the prognosis "good" (p. 20) is at variance with the constantly recurring infection found by Dr. Mika and the conclusion of Dr. Auerbach that the plaintiff suffers a progressively deteriorating condition (p. 116).

We perceive in this record no reason why the Appeals Council rejected the uncontradicted testimony of the attending physician and the vocational expert produced at the hearing of April 15,

1969. Kennedy v. Richardson, 454 F.2d 376 (3d Cir. 1972).

■ Absent a legal and justifiable reason for the rejection of such pertinent and controlling history and information regarding the plaintiff's past and present condition, we cannot accept the opinions of those reached, without knowledge and consideration thereof, as adequate to support the conclusion reached by the Appeals Council. Consolo v. Federal Maritime Commission, *supra*; Consolidated Edison Co. v. Labor Board, *supra*.

■ Therefore, considering the record as a whole, as we are obliged to do, we are compelled to conclude that the conclusions of the Appeals Council are not supported by substantial evidence.

As was said in Klimaszewski v. Flemming, *supra*, 176 F.Supp. at 931:

"* * * However, the definition of disability cannot be considered in vacuo. The definition relates to the individual claimant. 'The act is concerned not with a standard man of ordinary and customary abilities, but with the particular person who may claim its benefits and the effect of the impairment upon that person, with whatever abilities or inabilities he has'. Dunn v. Folsom, D.C.W.D.Akr. 1568, 166 F.Supp. 44, 48."

This case is not unlike the case of Stancavage v. Celebrezze, *supra*, where, in reversing and remanding the record, the Court said as follows, 323 F.2d at page 378:

"* * * There must be something (more) tangible establishing what employment opportunities there are for a man with his impairment. The failure of the Secretary to establish the existence of that kind of genuine employment opportunity is patent. And it must be presumed that the best available proof on this has been presented. That proof is unacceptable under Hodgson."

In the case of Bujnovsky v. Celebrezze, 343 F.2d 868 (3d Cir. 1965), as here, plaintiff suffered from emphysema. Understandably, his complaints and symptoms were similar. Although he looked after his personal needs, he did only small chores and took short walks. He suffered from shortness of breath, coughing, weakness, pains in the chest, and fatigue. There, as here, there was medical testimony that he was totally disabled. At page 871, the Court stated: "* * * [W]e agree with the district court that the plaintiff has adduced sufficient evidence to put the burden upon the Secretary to show that a reasonable employment opportunity is available to him (the plaintiff)." In affirming the order of the District Court granting the plaintiff's motion for summary judgment, the Court reiterated that the words "substantial gainful activity" must be read in the light of "what is reasonably possible and not what is conceivable * * *. Mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for this is available * * *". 343 F.2d at 870. As was said in Dillon v. Celebrezze, *supra*, "* * * Furthermore, the question of whether a claimant is disabled, as that term is used in the Act, is an inquiry which must be directed to that *particular individual*, not to a theoretical average man or even to an average claimant". 345 F.2d at 757.

Considering Dr. Mika's *uncontradicted* history of plaintiff's constant and recurring illness, the plaintiff's inability to regularly report for any type of employment and the resulting testimony of the vocational expert (p. 46) the conclusion is inescapable that plaintiff's ability to engage in substantial gainful employment is, in the language of the Court, above quoted, "theoretical" only. The medical opinions and conclusions reached without knowledge and consideration of such history and condition do not prove otherwise and are neither "substantial" nor supportive of a contrary conclusion.

Viewing the record as a whole, we conclude that it does not contain substantial evidence to support the conclusions reached by the Appeals Council.

On the entire record, we conclude that the denial of disability benefits to the plaintiff was erroneous.

Therefore, the plaintiff's motion for summary judgment will be granted and the Secretary's motion for summary judgment will be denied.