**William F. HAFNER**

v.

**Caspar WEINBERGER, Secretary of Health, Education and Welfare, United States of America.**

**Civ. A. No. 74–646.**

United States District Court,
E. D. Pennsylvania.

Oct. 9, 1975.

W. J. Krencewicz, Shenandoah, Pa., for plaintiff.

James Manning, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

GREEN, District Judge.

Presently pending before the Court are cross-motions for summary judgment on an appeal, pursuant to § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), of a final decision of the Secretary of Health, Education and Welfare denying plaintiff disability insurance benefits under the Act. The only issue before the Court is whether the Secretary's final decision that plaintiff is not entitled to disability insurance benefits is supported by substantial evidence. "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion". *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ginsburg v. Richardson,* 436 F.2d 1146 (3d Cir. 1971), *cert. den.* 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142, *rehearing den.,* 403 U.S. 912, 91 S.Ct. 2213, 29 L.Ed.2d 690 (1971). Further, as our Third Circuit has recently cautioned, " 'substantial' means just that and is not the equivalent of a 'scintilla' ". *Hess v. Secretary of HEW,* 497 F.2d 837 (3d Cir. 1974). Since the scope for reviewing the Secretary's decision is narrowly prescribed, the Court cannot try the matter *de novo, Toborowski v. Finch,* 363 F.Supp. 717 (E.D.Pa.1973), but rather must examine the entire record to see if the ruling is supported by substantial evidence. After a careful review of the record and briefs, and for the reasons hereinafter set forth, we grant the motion of plaintiff and deny the motion of defendant.

Plaintiff initially filed for disability benefits on February 9, 1971, alleging that he became unable to work on January 23, 1970 due to anthracosilicosis, emphysema and an arthritic spine. The Secretary initially denied his claim on June 8, 1971. On June 22, 1971, plaintiff filed a request for reconsideration which the Secretary denied on November 3, 1971. Plaintiff thereafter requested a hearing before an Administrative Law Judge; said hearing was held on December 6, 1972. In a decision of March 14, 1973, the Administrative Law Judge found that plaintiff was not entitled to a period of disability or to disability insurance benefits under the applicable provisions of the Social Security Act. Plaintiff appealed this decision to the Appeals Council, which, subsequent to obtaining additional medical evidence, on March 6, 1974, supplemented and affirmed the Administrative Law Judge's decision. The decision of the Appeals Council thus became the final decision of the Secretary and it is now before us on plaintiff's appeal.

I

The record reveals that plaintiff was born on May 7, 1919. After leaving high school during the tenth grade, he worked about 2 years cleaning automobiles on a used car lot. Prior to entering the military service, he pumped gas at a gas station. While in the armed forces, plaintiff drove a truck and did minor automotive tune-up work; however, he did not attend any military service schools and has not had any vocational training. During his military service in New Guinea plaintiff sustained a back injury while unloading heavy timbers from a truck. After he left the armed forces in 1945, plaintiff drove a truck around a strip mine operation. After driving a truck for approximately four years, he had to quit that kind of work because it affected his back. Plaintiff's next and last job was as an oiler of strip mining machinery. While working as an oiler, plaintiff experienced shortness of breath and he consulted his then family physician, Dr. William A. Schmidt. Dr. Schmidt informed plaintiff that he had advanced anthracosilicosis, emphysema and arthritis of the spine. Plaintiff continued to work until January 23, 1970, when he quit on the suggestion of Dr. Schmidt.

## II

An examination of the record also reveals the following medical evidence of plaintiff's physical impairments. Dr. William A. Schmidt, plaintiff's former family physician, reported in February 1971 that he treated him from 1967 to 1970. Dr. Schmidt's physical findings included restricted expansion of chest, prolonged expiration, and harsh and wheezy type respirations (Tr. 139). An x-ray taken at Dr. Schmidt's request on February 17, 1971 showed that plaintiff had a minimal, generalized emphysema with fibrotic changes throughout both lungs, suggesting an early stage two anthracosilicosis, and that plaintiff had hypertrophic, arthritic change throughout the thoracic spine (Tr. 141). Dr. Schmidt diagnosed plaintiff to be totally and permanently disabled due to advanced anthracosilicosis (second stage) and emphysema (Tr. 140).

At the request of the Government, plaintiff was examined by Dr. Stanley Stanulonis, an internist, on April 8, 1971. Dr. Stanulonis reported that plaintiff was dyspneic while at rest and also became dyspneic after a Single Masters Exercise Test; that he had Grade II retinal arteriole sclerosis; that he had prolonged wheezy expiration while recumbent; that bending produced pain in his back; and that his blood pressure before exercise was 190/100 and immediately after exercise 200/120 (Tr. 144). Pulmonary function studies before and after Isuprel revealed 43 percent of the predicted maximum voluntary ventilation; and 69 and 79 percent of the predicted vital capacity before and after Isuprel, respectively (Tr. 146-7). Plaintiff's chest x-ray revealed scattered small nodular opacities throughout both lungs, compatible with an early pneumoconiosis. An x-ray of the lumbar spine showed hypertrophic, arthritic changes primarily in the form of anterior spurring, and a slightly narrowed L-5, S-1 interspace (Tr. 148-9, 180). Dr. Stanulonis' overall impressions of plaintiff were: (1) pulmonary insufficiency due to anthracosilicosis with emphysema, chronic bronchitis and paroxysmal bronchial asthma; (2) essential hypertension (moderate); and (3) hypertrophic arthritis of the lumbar spine, question of disc injury (Tr. 145).

Plaintiff was examined again at the request of the Government by Dr. Leo J. Corazza, an internist, on October 5, 1971. His physical examination revealed a blood pressure of 180/110, arteriosclerosis of the arterioles of the eyes, and clubbing and breaking of the nail beds without cyanosis (Tr. 151). A chest x-ray demonstrated a pneumoconiosis and showed evidence of arthritis of the spine. Subsequent to an arterial study, Dr. Corazza's impressions of plaintiff were: (1) pneumoconiosis; (2) heart disease, hypertensive, arteriosclerotic, coronary artery disease, N.S.R., II-B; and (3) osteoarthritis of the spine (Tr. 152).

Plaintiff underwent an internal and external hemorrhoidectomy while hospitalized at the Ashland State General Hospital from April 24, 1972 to May 1, 1972 (Tr. 166-77). His laboratory studies were within normal limits (Tr. 167). His blood pressure was 160/120 and his electrocardiogram showed normal sinus rhythm and tracing (Tr. 176). A chest x-ray showed a generalized emphysema, with basilar nodular opacification and hypertrophic arthritic changes visible in the thoracic spine (Tr. 172).

Plaintiff, at the request of his family physician, Dr. Tomlin, underwent a pulmonary function study conducted at the Locust Mountain State Hospital on June 9, 1972. The study showed a vital capacity of 54 percent of the predicted, a one second forced expiratory volume ($FEV_1$) of 33 percent of vital capacity, and a maximum breathing capacity (MBC) of 32 percent of the predicted (Tr. 186). X-rays taken at Locust Mountain State Hospital on November 8, 1972 showed minimal sclerosis in each acetabulum of the pelvis suggesting early arthritis; hypertrophic, arthritic change throughout the lumbar spine; a

narrowing of the L–5, S–1 intervertebral disc space raising the question of disc disease at this level; arteriosclerotic changes in the aorta and iliac vessels; and, very minimal hypertrophic change in the cervical spine (Tr. 178–9).

Dr. Joseph Tomlin, who has been treating plaintiff since January 23, 1970, testified at the hearing before the Administrative Law Judge. Dr. Tomlin stated that at the time of his first examination, plaintiff complained of low back pain and shortness of breath on exertion such as walking about one block or climbing one flight of stairs. A physical examination disclosed a blood pressure of 190/110; hyperresonant breath sounds in the chest, prolonged expiratory phase; difficulty in straightening his arms up; paravertebral muscle spasms, tenderness, stiffness, pain with hyperextension of the spine (Tr. 45–6). The appearance of plaintiff's fingernail beds indicated partial deoxygenation on a chronic basis. Dr. Tomlin stated that a hemoglobin test done on July 24, 1972 provided confirmatory evidence of deoxygenation and poor pulmonary ventilation, secondary to his generalized emphysema (Tr. 46–7). Dr. Tomlin also referred in his testimony to the x-rays mentioned above, that were taken at Locust Mountain State Hospital, which showed hypertrophic arthritic changes in the lumbar spine, early arthritis in the hip, and a narrowing of the intervertebral space between L–5 and S–1. Dr. Tomlin stated that one of the x-rays showed significant arteriosclerotic changes in the iliac and femoral vessels which one would not normally expect to find in a man of age 53. Dr. Tomlin further stated that plaintiff's cholesterol level of 350 during his admission at Ashland State General Hospital would "fit in" with the diagnoses of arteriosclerotic heart disease and coronary artery disease reported by Dr. Stanulonis (Tr. 47).

Dr. Tomlin stated that he was treating plaintiff with various medications for hypertension, back pain, shortness of breath and wheezing. More specifically, Dr. Tomlin stated that through the use of 3 pills of Aldoril a day, he had been able to reduce plaintiff's blood pressure from 190/100 to only 150/110, "which is not good control" (Tr. 49, 51). With respect to plaintiff's hypertension problem, Dr. Tomlin indicated that it was probably not possible to achieve better control of the problem through medication because, when he attempted to up plaintiff's dosage to a fourth blood pressure pill, he got an adverse reaction (Tr. 60–1). Furthermore, Dr. Tomlin stated that plaintiff's arthritic spine condition had gotten progressively worse, that the arthritis of the hip will get worse with time, and that silicosis and emphysema usually get slowly and progressively worse (Tr. 50–1).

Dr. Tomlin testified that it was his opinion that plaintiff was completely and totally disabled as of January 23, 1970, and could not have engaged in substantial employment (Tr. 51). He also stated that plaintiff's condition had grown worse since January 23, 1970 (Tr. 52); that the findings of Dr. Stanulonis, who examined plaintiff on April 8, 1971, indicated that plaintiff could not engage in any gainful employment at that time (Tr. 52–3); and that in view of the findings of Dr. Stanulonis, Dr. Corazza and himself during the time period between January 23, 1970 and October 5, 1971, plaintiff could not engage in any light work of any kind (Tr. 52–4).

Under questioning by the Administrative Law Judge, Dr. Tomlin testified that work in a seated position, requiring occasional lifting of 10 to 20 pounds, would be medically contraindicated, because, whether sitting, standing or walking, the pain in his lower back would require him to change his position frequently (Tr. 56–7); and because if he had to work at a normal, working rate, he would be short of breath (Tr. 57). Dr. Tomlin further testified that even if plaintiff had the option either to sit or stand, and did not have to lift 10 pounds

more than 3 or 4 times a day, his continuous and chronic back pain would not permit him to work on a sustained basis throughout a normal eight-hour work day (Tr. 57–8). And Dr. Tomlin testified that if a job required plaintiff to stand throughout most of the day, lifting weights of 10 or possibly 20 pounds not more than 3 or 4 times a day, his back condition, silicosis and emphysema would cause him to be unable to perform that job (Tr. 58–9).

Plaintiff, William F. Hafner, also testified at the hearing before the Administrative Law Judge. Basically plaintiff delineated his subjective complaints. For instance, plaintiff stated that he stays in the house all winter long because he is susceptible to colds. He said he could not do any work about the house; that his wife took care of the coal furnace, took out the ashes, shoveled the snow, and cut the grass. Plaintiff testified that he could walk only about one block on level ground; if there was any kind of grade, he could not make it (Tr. 73).

Plaintiff testified that he had pain along the whole length of his back; since his hemorrhoidectomy, the pain ran from his spine to the base of his skull (Tr. 71). The back pain gives him a headache. If he stands for about 10 minutes, he "minds it" in his spine and legs (Tr. 73). He can't bend or kneel the way he should; and if he goes to bed, he has "a heck of a time getting up". When he elevates his arms, he gets pain. When he puts his socks and shoes on, he has difficulty bending over (Tr. 77). Plaintiff does not attend church because he cannot sit that long. He has a hard, dry cough, mostly at night, but also during the day (Tr. 71–2). Finally, plaintiff stated that he has difficulty sleeping some nights because of his back condition (Tr. 77) and his coughing and shortness of breath (Tr. 78).

A vocational expert, Mr. Bernard Orr, testified at the hearing before the Administrative Law Judge. Mr. Orr defined sedentary work activity as work which is done principally seated, and occasionally standing, which involves lifting a maximum of 10 pounds. He defined light work activity as work which may be done either sitting, standing or walking; which may involve lifting a maximum of 20 pounds and frequently involves lifting or carrying objects up to 10 pounds; and, which may require the pushing or pulling of hand-arm controls to a significant degree (Tr. 88).

During the questioning of Mr. Orr by the Administrative Law Judge, he was told to assume that plaintiff could do sedentary work, then he was asked whether any jobs existed for which he believed plaintiff was vocationally qualified. Mr. Orr testified that under the assumption that plaintiff could do sedentary work, there were jobs in the region that he might qualify for (Tr. 88–9). These jobs would be such jobs as an inspector or packer of clothing parts, a doorman in a movie theater or amusement center, a cashier in a restaurant, a security guard at a portal, a candy packer or candy wrapper, an inspector or gauger in a machine shop, a telephone bill collector, a truck or taxi dispatcher, or a shoe and shoe component inspector. Mr. Orr was then told to assume that plaintiff could do light work, and asked whether any jobs existed for which plaintiff was vocationally qualified. Mr. Orr testified that under the assumption that plaintiff could do light work, one would then assume he could do all the aforementioned sedentary jobs, plus such jobs as a retail salesman of hardware or paint, a drill press operator, an industrial guard, or a punch press operator (Tr. 92). Finally, Mr. Orr was told to assume all of the limitations, restrictions and pain testified to by plaintiff and Dr. Tomlin, and asked whether any jobs existed for which plaintiff was vocationally qualified. Mr. Orr responded with the following testimony:

There would no a—no work that I could think of, if you accept the limitations, restrictions and pain as described by Mr. Hafner and by Dr.

Tomlin because a man in constant pain and with his lack of physical strength a—as he testified, could not work (Tr. 93).

Finally, at the Government's request, Dr. Norman H. Wall, an internist, examined plaintiff on July 16, 1973. Plaintiff had a blood pressure of 220/130, Grade I arteriolarsclerosis, occasional rhonchi in the lungs and obesity (Tr. 189). A chest x-ray showed evidence of emphysema, some pulmonary fibrosis, and very slight nodule infiltrations at both bases (Tr. 190). The chest x-ray also showed evidence of osteoarthritis in the thoracic spine. The results of plaintiff's pulmonary function tests were markedly decreased (Tr. 190). These tests showed 36 and 40 percent of predicted maximum breathing capacity before and after bronchodilator, respectively. They showed 43 and 49 percent of predicted vital capacity before and after bronchodilator, respectively. And they showed a one second forced expiratory volume of 41 and 45 percent of the predicted value before and after bronchodilator, respectively (Tr. 195, 198, 201, 204). Dr. Wall concluded in his report that plaintiff "has a very significant pulmonary insufficiency"; "is strictly limited now from doing any type of exertive activity such as climbing stairs frequently or climbing a hill, carrying any bundles weighing more than 25 lbs."; and he doubted that "any type of therapy will improve his pulmonary function substantially to get him back at work" (Tr. 190). Dr. Wall's final diagnoses were: (1) pneumoconiosis with chronic obstructive lung disease, (2) hypertension, (3) obseity, and (4) osteoarthritis.

III

In his brief, plaintiff asks this Court to address the following two issues: (1) Did the Appeals Council err in ignoring plaintiff's subjective complaints in its evaluation of the evidence, and (2) Is the denial of disability benefits supported by substantial evidence?

■ With respect to the first issue, we find no error in the decision of the Appeals Council. Plaintiff is correct in his observation that that portion of the decision of the Appeals Council captioned "Evaluation of the Evidence" does not mention the plaintiff's subjective complaints. However, the omission of any reference to plaintiff's subjective complaints by the Appeals Council does not necessarily mean that the Appeals Council completely disregarded the subjective testimony of plaintiff. We find it significant that the decision of the Appeals Council opens with the following statement:

The administrative law judge's statements in his decision as to the pertinent provisions of the Social Security Act and the evidentiary facts which were before him, are incorporated herein by reference.

The decision of the Administrative Law Judge summarized and took into account plaintiff's subjective complaints, and plaintiff does not contend otherwise. Though the decision of the Appeals Council omits any reference to plaintiff's subjective complaints, we do not find this omission in the particular case now before us to be reversible error, since the decision of the Appeals Council incorporates the evidentiary facts before the Administrative Law Judge. Having addressed the first issue raised by plaintiff, we proceed to a discussion of his second question.

■ Plaintiff has the burden of proving that he has a disability within the meaning of the Social Security Act. 42 U.S.C. § 423(d)(5).[1] Establishing a disability is a two-step process. First, plaintiff must prove that he has a medi-

1. 42 U.S.C. § 423(d)(5) provides in relevant part:
An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require.

cally determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. Second, plaintiff must prove that the impairment renders him unable to engage in any substantial gainful employment. *Baker v. Gardner,* 362 F.2d 864 (3d Cir. 1966); *Bujnovsky v. Celebrezze,* 343 F. 2d 868 (3d Cir. 1965).

■ In the instant case, plaintiff has clearly met his burden of proving that he has medically determinable physical impairments. The evidence is undisputed and overwhelming that plaintiff has been suffering from physical impairments variously diagnosed as being: (1) anthracosilicosis, pneumoconiosis, emphysema, chronic bronchitis or paroxysmal bronchial asthma, (2) hypertrophic arthritis of the lumbar spine or osteoarthritis of the spine, and (3) hypertension or arteriosclerosis. We note that there is no disagreement between plaintiff's or the Government's physicians as to the existence of physical impairments. The disagreement, if any, between the physicians center mainly on the degree of intensity of plaintiff's physical impairments.

■ Though the Secretary concedes that plaintiff suffers from various physical impairments, nevertheless, the Secretary contends that plaintiff's impairments are not of such a severity as to render him unable to engage in any substantial gainful employment. More specifically, the Appeals Council found that plaintiff "retains the functional capacity to perform substantial gainful activity in the light and sedentary jobs enumerated by the vocational expert" (Tr. 9).

We find that plaintiff has also met his burden of proving that his physical impairments rendered him unable to engage in any substantial gainful employment, and there is not substantial evidence to support the Secretary's finding to the contrary. Dr. Schmidt, who treated plaintiff from 1967 to 1970, diagnosed plaintiff as being totally and permanently disabled. Dr. Joseph Tomlin, who has been treating plaintiff since 1970, testified that in his professional opinion plaintiff was totally disabled as of January 23, 1970; that plaintiff's condition has grown worse since that time; that plaintiff is unable to engage in substantial employment; and, that plaintiff cannot do, what by definition would be, light or sedentary work. Nevertheless, the Appeals Council contends that plaintiff can do light or sedentary work. Their determination in this regard rests solely upon their interpretation of the testimony of the vocational expert, Mr. Orr, and the report of the internist, Dr. Wall.

In its summary of the vocational evidence, the Appeals Council states the following:

A vocational expert who testified at the hearing stated that in view of the claimant's age, education, vocational background and impairments and given the limitations imposed by light to sedentary work activity, he retained the functional capacity to perform such work as a clothing inspector or packager, doorman in a movie theater, cashier in a restaurant, . . . (Tr. 7).

This characterization of Mr. Orr's testimony is misleading and incorrect. Mr. Orr did not state in his testimony that plaintiff retained the functional capacity to perform light or sedentary work. Mr. Orr, responding to hypothetical questions being posited by the Administrative Law Judge, merely testified that certain enumerated jobs existed in the economy for light and sedentary work classifications; and he made no finding as to the plaintiff's functional capacity to do work of any kind.

Finally, in its evaluation of the evidence concerning plaintiff's cardiovascular problems, the Appeals Council states the following:

In addition, the independent specialist in internal medicine concluded, in effect, that while the claimant would be precluded from moderate to arduous

activity involving lifting over 25 pounds and frequent climbing, he retained the functional capacity to engage in physical activity of a light to sedentary nature (Tr. 8).

And with respect to plaintiff's pulmonary impairments, the Appeals Council states the following:

In addition, the consultant indicated, in effect that the claimant was only precluded from engaging in physical activity of a medium to heavy nature and that he should avoid contact with dusty and fume laden environments (Tr. 8–9).

This characterization of Dr. Wall's testimony is also misleading and incorrect. In his report Dr. Wall in fact stated the following:

In Summary: This man has a very significant pulmonary insufficiency. As a matter of fact, his pulmonary function tests are markedly decreased and our observations were checked and rechecked under the supervision of a physician who did these tests in our office. The man was cooperating during the test and he obviously was producing genuine results.

This man is strictly limited now from doing any type of exertive activity such as climbing stairs frequently or climbing a hill, carrying any bundles weighing more than 25 lbs. He certainly can't continue doing any type of strip mining with this amount of pulmonary difficulty.

So far as rehabilitation and treatment, I doubt that any type of therapy will improve his pulmonary function substantially to get him back at work. He has a combination of pneumoconiosis from the mines and long-standing cigarette smoking and I think unless he loses weight, gets his blood pressure down, inexorably he shall probably get worse (Tr. 190).

Thus, initially we note that the aforementioned statements contained in Dr. Wall's report relate to plaintiff's pulmonary impairments, not his cardiovascular problems. The reference by the Appeals Council to Dr. Wall's statement in its evaluation of plaintiff's cardiovascular problems is, therefore, incorrect. Further, we note that Dr. Wall in fact merely states that plaintiff cannot do the medium or heavy work associated with strip mining. Such a statement appears to be quite logical since, as is apparent from the beginning of Dr. Wall's report, the scope of Dr. Wall's knowledge of plaintiff's work record was limited to strip mining. Dr. Wall is silent as to plaintiff's capacity, or lack thereof, to engage in physical activity of a light to sedentary nature. Clearly the Secretary may not transform Dr. Wall's silence on the issue into a positive statement that plaintiff can do such work. Particularly when such silence is offset by Dr. Tomlin's affirmative statement that the plaintiff cannot do light or sedentary work.

Finally, we note that the Appeals Council draws, from Dr. Wall's statement that the plaintiff cannot do any type of exertive activity, the inference that plaintiff can in fact do light or sedentary work. This inference is not supported by logic or human experience, and thus is not probative of the plaintiff's ability to do light or sedentary work. Without this inference the record is totally devoid of evidence to support the Secretary's determination denying benefits.

In view of the facts in the case *sub judice,* the applicable legal principle appears in the case of *Kennedy v. Weinberger,* 369 F.Supp. 336 (E.D.Pa.1974), wherein the court stated:

. . . While an expert medical opinion as to disability to engage in substantial gainful employment is admissible for consideration by the Hearing Examiner, and not, in itself, binding upon him, nevertheless, if such opinion is not controverted by substantial evidence to the contrary, the Hearing Examiner's decision adverse to such expert medical opinion, must be set aside. *Id.,* at 339, *quoting*

*Colwell v. Gardner,* 386 F.2d 56, 72 (6th Cir. 1967).

Here, the plaintiff has submitted objective medical and clinical evidence. Also, he has submitted diagnoses or medical opinions based upon this evidence, subjective evidence of his pain and disability, and evidence of his age, educational background and work history. Viewing the record as a whole, we find that there is substantial evidence to support the plaintiff's claim for disability. Conversely, we find that the Secretary's finding of no disability was not based upon substantial evidence in the record considered as a whole. Accordingly, we reverse the decision of the Secretary and enter the following order.

### ORDER

And now, this 9th day of October, 1975, upon consideration of the cross-motions for summary judgment, it is ordered that:

(1) the motion of plaintiff for summary judgment is granted, and

(2) the motion of defendant for summary judgment is denied.