Agnes M. BOLTON, Plaintiff,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.

No. 79 C 1742.

United States District Court,
E. D. New York.

Nov. 14, 1980.

---

Agnes M. Bolton, plaintiff pro se.

Edward R. Korman, U. S. Atty., E. D. New York, Brooklyn, N. Y., by Jan F. Constantine, Asst. U. S. Atty., Brooklyn, N. Y. (Frank V. Smith, III, Acting Regional Atty., and Linda Lee Walker, Dept. of Health and Human Services, New York City, of counsel), for defendant.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This action to review a denial of Social Security disability insurance benefits, for which plaintiff had applied, was initially referred to a United States Magistrate to review the administrative record, hear the contentions of the parties, and report to the court his recommended disposition of the defendant Secretary's motion for judgment on the pleadings. The matter is now before the court on the Magistrate's report recommending that the case be remanded to the Secretary for reconsideration because, in the Magistrate's view, the *de novo* hearing was wholly inadequate to fairly evaluate plaintiff's claim of disability. After an independent searching review of the administrative record, the brief on behalf of the Secretary and the Magistrate's report the court does not agree that a remand is necessary and affirms the Secretary's determination for the reasons noted below.

Plaintiff, now 51 years of age, is a high school graduate and has a history of employment from 1951 until 1970 (Tr. 22–23, 67). During that time she worked as a sewing machine operator in a children's coat factory, made doll clothes in a doll factory, assembled plastic toys, worked as a nurse's aide in a nursing home and in a hospital and was self–employed as cook and waitress in a snack bar from 1962 to 1970 (Tr. 22–23, 129–30). She stopped working in 1970 because she could not stand on her legs. (Tr. 31).

Plaintiff's application for disability insurance benefits was filed on August 11, 1976. Since her insured status expired on December 31, 1975, it was incumbent upon her to establish the existence of a disabling illness or condition antedating that date. Following denial of benefits on original consideration (Tr. 56), plaintiff was awarded disability benefits on reconsideration of her application on February 24, 1977, retroactive to August 1975 (Tr. 59–60). The award appears to have been based on a diagnosis of bronchial asthma, old phlebitis of the leg and a history of migraine, all dating back to June 30, 1973 (Tr. 59). Plaintiff's award was short–lived, however, because her claim was again reviewed and denied in light of prior findings of medical consultant experts indicating that "no condition is seen which would establish more than a minimal impairment" (Tr. 62–63). That conclusion was reached despite a letter from Dr. Robert M.

Simpson, who was then apparently treating plaintiff, which stated she was "unemployable because of the following pathology: –A. Phlebitis. B. Bronchial asthma. C. Mixed arthritis" (Tr. 121). Plaintiff thereafter sought and was granted a *de novo* hearing before an administrative law judge (ALJ), whose determination ultimately became the decision of the Secretary here under review.

At plaintiff's hearing, which was held on February 17, 1978, plaintiff testified she stopped working in 1970 because she couldn't stand on her legs and still "can't stand and can't walk" (Tr. 31). Plaintiff's husband, who also testified, stated that on doctor's orders she had to sleep on a lower floor of their dwelling so she would not have to walk upstairs (Tr. 46–47). This was after plaintiff had been admitted to the emergency room of Wyckoff Heights Hospital, where she was hospitalized from November 22 to December 10, 1977 (Tr. 144). According to the hospital record, received by the ALJ after the testimonial hearing had closed, her chief complaint was noted to be "dizziness and headache" and the initial impression on admission was that she was suffering from acute coronary insufficiency and hypertension (Tr. 144–45). The final diagnosis upon her discharge was "coronary insufficiency. Myopathy" (Tr. 146), the latter term being defined as "any disease of a muscle." [1]

During plaintiff's stay in the hospital she gave a past history of hypertension the previous summer, for which she took pills which made her feel dizzy. She had no history of diabetes or heart condition, although her blood pressure was 160/94, and she was found to be a "fairly developed, nourished, conscious, alert female not in any acute respiratory distress" (Tr. 144). During her hospital stay she had a few episodes of dizziness, but essentially her stay was quite unremarkable (Tr. 145). She was instructed to avoid coronary risk factors and possible allergies and unnecessary tensions (Tr. 146).

In his decision the ALJ concluded there was nothing in the Wyckoff Heights Hospi-

tal report in December 1977 which could be related back to plaintiff's condition prior to December 31, 1975, when she was last insured (Tr. 11). The same might be said of Dr. Hyung J. Youn's brief report, dated January 27, 1978, just prior to the hearing, which stated only that plaintiff was under his care for coronary insufficiency and hypertension and also "has arthritis" (Tr. 134).

For the period prior to December 31, 1975, the ALJ had a report from Dr. Bernard Mattikow, a general practitioner, who treated plaintiff for hypertension during September, October and November 1975, and had not seen her since. Her condition responded to medication, and Dr. Mattikow found no end organ involvement or retinopathy. Plaintiff gave Dr. Mattikow a history of treatment for varicose veins two years prior to September 1975 but according to his records, when he saw her she did not have them, only some discoloration.

Also before the ALJ were reports of two consultative medical experts who had examined plaintiff in connection with her application for disability benefits. Dr. Benjamin Yentel, a specialist in internal medicine and cardiovascular diseases, examined plaintiff on September 28, 1976, and reported her chief complaint as occasional episodes of migraine headaches since several years ago, and also for the past five or six years episodes of pains in the joints, mainly over both shoulders, both knees, feet and back around the lumbosacral spine area, for which she is taking analgesics (Tr. 102–09). She gave a history of having been under treatment for bronchial asthma for the past 15 years, with one episode per week; and having previously been under treatment for hypertension until a month ago when medications were discontinued; and that two years ago she had been under treatment for an episode of phlebitis of the right lower extremity, as to which the doctor noted a "moderate to severe pigmentation" over that extremity. She denied any other symptoms or complaints, or previous medical or surgical history. On physical exami-

---

1. See Dorland's Medical Dictionary, 24th ed.

nation she was 5 feet 4 inches tall, weight 142 pounds, blood pressure 140/72 and was described as a well–developed, well–nourished female in no acute distress (*id.*). Dr. Yentel found no bronchial asthma as of the time of the examination or any other abnormality, except an irregular narrowing of the posterior aspect of the right seventh rib as revealed on x–ray examination. The etiology of this finding was not determined but his opinion was that it was not a progressive lesion "since the cortex is intact" (Tr. 102). He also noted that there was no cardiac enlargement based either on x–ray evidence or physical signs (Tr. 103).

Dr. Herbert Lapinsky, a specialist in internal medicine, examined plaintiff some five months later on February 8, 1977 (Tr. 111–18). At that time she gave him a history of "bronchial asthma" for which she takes pills and liquid medication, "migraine" and low back pains, and phlebitis of the right leg at age 38. Dr. Lapinsky found plaintiff in no acute distress, well–developed and well–nourished, height 5 feet 6 inches, weight 150 pounds, and blood pressure 130/80. His examination revealed no abnormalities except for 1–plus edema in the lower extremities, and an area of hyperpigmentation, tenderness and swelling over the medial aspect of the right lower leg. He also noted that her pulmonary ventilation tests revealed "all values to be diminished" but attributed this to poor cooperation on her part in taking the tests. X–ray examination revealed normal lungs and a heart condition of "borderline cardiomegaly," defined as "the morbid enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells."[2] Dr. Lapinsky's final impression was that plaintiff did have bronchial asthma, old phlebitis of the right leg and migraine by history (Tr. 111).

█ On the record as a whole this court cannot say there was a lack of substantial evidence to support the Secretary's determination that plaintiff's claimed illnesses prior to December 31, 1975, were not of such severity as to prevent her from engaging in

gainful activity of any kind existing in the national economy. Her own doctor's report of treatment during the last quarter of 1975 showed her only current illness as hypertension, which had responded to medication. The findings of the consultative medical experts in the examinations conducted in September 1975 and February 1977 were essentially negative as to any severe disabling physical condition dating back to pre–December 1975 (Tr. 102, 111), and the thorough report of Wyckoff Heights Hospital in November–December 1977 (Tr. 144–46)–almost two years after the termination of her insured status–reported a heart condition (acute coronary insufficiency) which plaintiff testified was new to her (Tr. 33), even though she maintained she was still suffering from asthma (*id.*). While that condition was listed as one of her pathologies by Dr. Simpson in August 1977 which made her "unemployable" (Tr. 121), it was not evident on the physical examination conducted by her treating doctor in the fall of 1975 (Tr. 55).

█ In considering plaintiff's subjective testimony of pain, it is well established that "[t]he ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). Here, the ALJ after considering the record as a whole did not accord credence to plaintiff's testimony as to her disability prior to December 31, 1975 in light of the substantial medical evidence contradicting such a claim.

█ Furthermore, plaintiff's testimony of "constant pain" at the *de novo* hearing cannot be accepted as conclusive on the issue of disability existing prior to 1976. If it were otherwise, such declarations would automatically establish entitlement to insurance benefits in every case. The credibility of a claimant's subjective complaints of pain clearly must be examined in relation to all the other evidence of record in order

2. See Dorland's Medical Dictionary, 24th ed.

to determine whether the degree of pain could be so severe and so continuous as to render a claimant incapable of carrying on any occupation suitable to the claimant's age, education, skills, experience, and residual functional capacity. *Italiano v. Secretary of Health, Education and Welfare,* 458 F.Supp. 982 (E.D.N.Y.1978), *aff'd without opin.,* 603 F.2d 213 (2d Cir. 1979).

 In view of the array of medical evidence before and after December 31, 1975, establishing that plaintiff was not completely disabled, the ALJ was warranted in considering whether or not there were jobs in the national economy she could undertake. Although he proceeded on a hypothetical basis, some justification for that exists since what was really at issue is whether plaintiff had been disabled during the period prior to the expiration of her insured status. Although the Wyckoff Heights Hospital report was still outstanding, the ALJ elicited from a qualified vocational expert present at the hearing a description of bench assembly jobs, inspection jobs, cashier or accounting clerk positions that were of a sedentary nature.[3] Plaintiff was approximately 45 years of age at the time her insured status expired, and a high school graduate. She might well have qualified for such work, all of which were considered sedentary occupations (Tr. 44). Whether plaintiff could actually obtain employment in any of the job categories described by the vocational expert is not the question. The statute defining "disability," 42 U.S.C. § 423(d)(2)(A), "specifically precludes consideration of whether the claimant 'would be hired if [s]he applied for work'." *Rivera v. Harris,* 623 F.2d 212, 216 (2d Cir. 1980).

Accordingly, in the face of the legislative mandate, the court cannot say that the hearing afforded plaintiff was so inadequate as to overcome the substantial evidence supporting the Secretary's denial of disability insurance benefits in this case. The Secretary's determination is therefore affirmed and judgment is granted dismissing the complaint.[4]

SO ORDERED.

---

**3.** " *Sedentary Work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Regulation § 404.-1567(a).

**4.** This decision does not, of course, preclude plaintiff from applying for Supplemental Security Income benefits for any current disabling condition which prevents her from engaging in gainful activity.