Pasquale A. LaCORTE, Plaintiff,

v.

Otis R. BOWEN, etc., Defendant.

Civ. No. 85–705 (AET).

United States District Court,
D. New Jersey.

Jan. 28, 1988.

Sally Purrazzella, Toms River, N.J., for plaintiff.

Stephanie Ebers, Asst. U.S. Atty., Newark, N.J., for defendant.

## OPINION

ANNE E. THOMPSON, District Judge.

Plaintiff, Pasquale A. LaCorte, seeks review under § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to review a final determination of the Secretary of Health and Human Services ["Secretary"] which denied plaintiff's application for a period of disability and disability insurance benefits.

## PRIOR PROCEEDINGS

Plaintiff initially filed an application for disability insurance benefits on March 21, 1983. Plaintiff was alleging disability dating from October 1, 1982, due to a heart condition and coronary artery disease. The application was denied initially and then again upon reconsideration. On June 19, 1984 a hearing was held before an Administrative Law Judge ["ALJ"] to review plaintiff's application. The ALJ's decision of September 25, 1984 found the plaintiff to be "not disabled". This decision became the final decision of the Secretary when the Appeals Council denied plaintiff's request for review on January 9, 1985.

Subsequently, plaintiff filed a complaint in this court appealing the Secretary's decision. The District Court remanded the case to the Secretary pursuant to Section 5 of the Disability Benefits Reform Act of 1984. The Appeals Council remanded the case to an ALJ pursuant to the District Court's Order. At the second administrative hearing on August 11, 1986, the ALJ again denied plaintiff disability benefits. On November 18, 1986, the decision of the Secretary became final. Plaintiff filed another complaint in this court.

## EVIDENCE PRESENTED

Plaintiff was born on December 30, 1937 and was 48 years old at the time of the second administrative hearing. In September 1981 plaintiff underwent coronary bypass graft surgery. Because of continual chest pain in the following months, the plaintiff underwent re-cardiac catheterization on November 30, 1982.

Plaintiff completed the sixth grade in school. Plaintiff testified that he believes that he has taken the high school equivalency examination but that he did not pass it. Plaintiff had indicated on a social security form that he completed the 12th grade, but when questioned about that by the ALJ plaintiff stated that the information concerning his education was not accurate.

Plaintiff stated that he worked as a truck driver for a soft drink company from November 1962 to December 1966. From October 1966 to December 1969, plaintiff drove a tractor-trailer for a freight hauling company. Plaintiff was an armed security guard at a scrap metal company from November 1973 through October 1978. The most recent job held by the plaintiff was as a security officer for a casino from October 1979 to October 1982.

Since his quadruple bypass surgery in 1981, plaintiff has complained of recurring chest pains, tiredness, and dyspnea. Plaintiff also suffers from "panic attacks" resulting in sweating, shaking and in his heart racing. Plaintiff indicates that the "panic attacks" are brought on due to his heart condition and his constant thoughts about his condition.

After his operation in September 1981, plaintiff experienced some tachyarrhythmias and rapid atrial fibrillations. Medication was given to plaintiff to stabilize his heart rate. An electrocardiogram performed on April 12, 1981, did not produce chest pain, and plaintiff achieved a workload of 8.7 METS, a functional capacity equal to New York Heart Association Class 1.

In November 1982 a left heart catheterization, ventriculography left and selective cine coronary arteriography were performed. Only one of the vessels involved in the operation was not working well, and according to the cardiologist, Dr. Duca, the obstruction in the vessel was "not a highly critically obstructed lesion."

In January 1984 plaintiff underwent another exercise electrocardiogram. There were no significant atrial or ventricular arrhythmias detected. The test was stopped for progressive fatigue rather than for chest pressure. The cardiologist, Dr. Blacher, noted that "[i]t is highly possible that his chest pressure and fatigue are secondary to his ischemic heart disease ... [h]owever ... there [were] no ischemic ST-segment changes to support this notion." Dr. Blacher stated that the plaintiff's work capability seemed to be around 8 to 9 METS, but "he can probably perform more comfortably at a work level of 6 to 7 METS."

Dr. Duca of Graduate Hospital thought a Thallium study would be helpful in determining the cause of plaintiff's chest pain since he was not sure that the nitrate therapy would control plaintiff's symptoms. The reason for this, Dr. Duca states, is "I still have a doubt that [plaintiff's] symptoms are anginal."

A Thallium Stress Test was performed in January 1986. Although plaintiff did not achieve the optimal exercise level for the test, the radiologist, Dr. Simpson, reported that there were "no findings to suggest the presence of ischemia." Plaintiff felt no chest pain in the 9 minute 40 second exercise test. The test suggested to Dr. Simpson that the plaintiff got "inadequate exercise."

In June 1984 plaintiff's treating physician, Dr. Mehta, reported that the plaintiff's long-term prognosis was "guarded" and "unpredictable," but that at the present he was "in stable condition."

On March 21, 1986 plaintiff was examined by consulting physician Panico. In his report, Dr. Panico listed several general limitations on plaintiff's ability to perform work related activities. Included in those limitations were problems lifting and carrying more than five pounds; standing four out of eight hours, never an hour at a time; climbing, stooping, kneeling; reaching, pushing, pulling; extreme changes in temperature; noise, fumes, and humidity; and engaging in unusual activity.

In November of 1983 plaintiff was sent to see a psychiatrist about his "panic attacks." The psychiatrist, Dr. Berkowitz, found that "[t]here may be some realistic justification to his fears about his heart, but that would have to be judged by the cardiologist who sees him, but if his heart condition is not that severe and I rather doubt that it is, he is suffering from a severe phobic disorder. I advised him to see his cardiologist about whether he is justified in being so fearful, and if he is not justified, then he should seek psychiatric treatment."

A few years later, psychiatric evaluations were performed by Dr. Barbanti and also by Dr. Rose, of the Therapeutic Intervention Center. On April 15, 1986, Dr. Barbanti saw the plaintiff. The diagnosis was that psychological factors were affecting plaintiff's physical condition. The prognosis was "guarded" and though Dr. Barbanti acknowledged that plaintiff had a realistic reason for his anxiety, he stated "without some psychiatric assistance this condition is, in all likelihood, chronic." Dr. Barbanti reported in his findings that plain-

tiff would be "incapable of paying attention to any job."

The Therapeutic Intervention Center performed an intake interview, as well as administering three tests: WAIS–R, MMPI, and Goodenough–Harris Drawings. The Clinical Director, Dr. Rose, suggested treating plaintiff with behavior modification techniques. In the medical assessment of ability to do work related activities, the examining physician rated the plaintiff as "very good" or "good" on every category, except for ability to deal with work stresses which was rated as "fair."

A vocational expert, Mr. Wolf, testified that if plaintiff has all the limitations, restrictions and pain that he had testified to, the plaintiff would not be able to hold a job on a sustained, competitive basis. The ALJ then gave Mr. Wolf hypothetical questions that included the limitations and restrictions which Drs. Rose and Panico had identified plaintiff as having as a result of his mental impairment. Given those limitations, the vocational expert identified a number of sedentary jobs which plaintiff could perform.

Plaintiff testified that he now spends most of his time resting, watching television, and listening to his c.b. radio. Plaintiff states that he sometimes walks one to two blocks and rides the stationary bicycle on occasion.

## DISCUSSION

A decision of the Secretary concerning disability benefits must be upheld by the court if an examination of the record reveals substantial evidence supporting the Secretary's conclusion. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting*, *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938), *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir.1981). If there is only a slight preponderance of the evidence on one side or the other, the Secretary's find-

ing should be affirmed. *Toborowski v. Secretary of Health, Education and Welfare*, 363 F.Supp. 717 (E.D.Pa.1973). Thus, the court is to look at the record as a whole and then determine whether or not there is substantial evidence to support the Secretary's decision. *Taybron v. Harris*, 667 F.2d 412, 413 (3d Cir.1981), *quoting Hess v. Secretary of Health, Education and Welfare*, 497 F.2d 837, 841 (3d Cir.1974).

■ The ALJ must analyze all of the evidence in the record and provide adequate explanations for disregarding or rejecting evidence. *Cotter v. Harris*, 642 F.2d 700 (3d Cir.1981). If the ALJ concludes that testimony is not credible, the ALJ must indicate the basis for that conclusion in his decision. *Id.* at 705–706. The ALJ must give serious consideration to the plaintiff's subjective complaints of pain, even when those assertions are not fully confirmed by objective medical evidence. *Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir.1986). The ALJ, though, is not obliged to accept without question the credibility of such subjective evidence. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979). The ALJ has discretion "to evaluate the credibility of a claimant and to arrive at an independent judgment in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant." *Brown v. Schweiker*, 562 F.Supp. 284, 287 (E.D.Pa.1983), *quoting*, *Bolton v. Secretary of HHS*, 504 F.Supp. 288 (E.D.N.Y.1980).

■ In this case, the ALJ did not find the plaintiff's testimony credible, and therefore did not give much weight to the plaintiff's subjective complaints of pain. The ALJ clearly states in his decision his reasons for questioning the credibility of plaintiff's testimony. There is also support in the medical records for the conclusion that plaintiff's pain may not be as restrictive as plaintiff claims.

On April 12, 1981 plaintiff was given an exercise electrocardiogram, which revealed his functional capacity to be equivalent to New York Heart Association Class 1. The plaintiff achieved a peak workload of 8.7

METS. Another exercise electrocardiogram was done on January 5, 1984. The diagnostic results were limited since the plaintiff fatigued early, but the impression of the cardiologist was that the plaintiff could "comfortably perform at a workload of 6 to 7 METS." A report by Dr. Duca following plaintiff's catheterization in November 1982 revealed that the cardiologist had some doubts whether plaintiff's pains were anginal. Dr. Duca's examination showed that the grafts done in 1981 were still functioning well, except for one. The bypassed vessel that was occluded was "not a highly critically obstructed lesion." A Thallium Stress Test done on January 30, 1986 revealed no abnormalities to suggest the presence of ischemia. The radiologist noted, though, that the plaintiff's exercise level was suboptimal since the heart did not reach 85% of the predicted maximum heart rate. In addition, an echocardiograph done in January 1986 showed only borderline left ventricular hypertrophy.

The ALJ's finding that the plaintiff's non-exertional impairment did not limit his ability to perform substantial gainful activity is also supported by substantial evidence. Although there is conflicting evidence on this issue, it is within the ALJ's discretion to weigh the medical assessments and to resolve the conflict accordingly. *Richardson v. Perales, supra,* 402 U.S. at 399, 91 S.Ct. at 1426. The ALJ seems to give more weight to the medical findings of Dr. Rose of the Therapeutic Intervention Center than those of Dr. Barbanti. The ALJ does not reject Dr. Barbanti's conclusions, but finds instead that given the plaintiff's lack of credibility, and unwillingness to seek psychiatric treatment, the ALJ will give more weight to Dr. Rose's findings. In his decision the ALJ also points to the fact that all of the doctors suggest that the plaintiff could improve his mental condition. The ALJ has adequately explained in the record his reasons for rejecting or discrediting probative evidence as is required by the courts in this jurisdiction. *Cotter v. Harris, supra,* 642 F.2d at 705. *See also, Benton for Benton v. Bowen,* 820 F.2d 85, 88 (3d Cir.1987).

The ALJ found by relying on the evidence and testimony he deemed credible that the plaintiff's exertional and nonexertional impairments, while possibly severe, were not disabling. Since the impairments were not listed in Appendix 1 of Subpart P of Regulation No. 4, the ALJ turned to a consideration of existing vocational factors, i.e. plaintiff's age, education and work experience to determine whether his impairments were disabling. By applying the Vocational–Medical guidelines ["grids"] set forth in Appendix 2 of Subpart P of Regulation No. 4, the ALJ can determine if, given plaintiff's exertional impairments, he has the residual capacity to do gainful work. The ALJ in this case determined that plaintiff was "not disabled" according to the grids and could do sedentary work. *See* 20 C.F.R. Rule 201.19, Table No. 1, App. 2, Subpart P, Regulation No. 4.

Since non-exertional impairments also existed, a vocational expert was used to evaluate the plaintiff's residual capacity to do light or sedentary work, considering both plaintiff's exertional and non-exertional impairments. At the hearing, the ALJ submitted a hypothetical question to the vocational expert setting forth the plaintiff's limitations as established by Drs. Rose and Panico in their medical findings. Based on that hypothetical question, the vocational expert testified that the plaintiff had the residual functional capacity to engage in security jobs, and that those jobs existed in significant numbers in the national economy. *See* 20 C.F.R. § 404.1566.

The ALJ relied on the testimony of the vocational expert and the medical evidence in the record to support his conclusion that the plaintiff retained the residual capacity to perform gainful work. The fact that a different conclusion could have been reached based on the evidence in the record does not undermine the ALJ's decision, as long as there is substantial support for that decision in the record. *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972); *see also Hawkins for Reilly v. Heckler,* 631 F.Supp. 711, 716 (D.N.J.1985).

For the foregoing reasons, this court finds that the decision of the ALJ is sup-

ported by substantial evidence and the decision that the plaintiff is "not disabled" is hereby affirmed. January 27, 1988.