Jose GOMEZ, Plaintiff,

v.

Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.

Civ. A. No. 89–K–1925.

United States District Court, D. Colorado.

April 12, 1991.

Doug George, Colorado Rural Legal Services, for plaintiff.

Paula Ray, Asst. U.S. Atty., for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This is an appeal under 42 U.S.C. § 405(g) of a final decision of the Secretary of the Department of Health and Human Services (Secretary) denying Jose Gomez's request for Supplemental Security Income (SSI). There are two issues in this appeal: (1) whether the Appeals Council erred in denying further review by failing to consider the transcript of Mr. Gomez's hearing before the administrative law judge (ALJ), and (2) whether the Secretary's decision that Gomez does not qualify for SSI benefits is supported by substantial evidence. I conclude that the Secretary erred on both counts, reverse his decision and remand for an award benefits to Mr. Gomez.

### I. *Facts.*

Mr. Gomez first applied for SSI benefits on November 14, 1984. In that application, Gomez claimed that he was disabled due to an uncontrolled seizure disorder, alcoholism, and a shoulder injury. His application was denied, but the decision was vacated and the matter remanded for reconsideration under the new guidelines enacted in

the Social Security Disability Benefits Reform Act of 1984, Pub.L. No. 98–460, 98 Stat. 1794, because of Gomez's alleged disability based on mental impairment.[1]

On remand, Gomez's 1984 application was forwarded to Colorado Disability Determination Services (DDS), the state agency that has contracted with the Social Security Administration to provide initial and reconsideration disability determinations. Based on a psychiatric evaluation by Dr. Glenn Kimata, the DDS found that Gomez was mentally disabled. This finding was subsequently revised by Dr. Kimata when he learned that Gomez's mother had passed away the day before the examination. After a follow-up examination by a second physician, Dr. Kimata's diagnosis of major depression was changed to grief and the finding of disability reversed.

Gomez thereafter requested and was granted a hearing before the ALJ, who likewise found that Gomez was not disabled. The ALJ ruled that, despite his complaints, Gomez had no impairment or combination of impairments severe enough to warrant a finding of disability based on medical considerations alone. While his combination of impairments placed some limitations on the work he could perform, the ALJ concluded that Gomez had the residual functional capacity, given his non-exertional and environmental limitations, to perform medium work not involving dangerous machinery or heavy lifting. Accordingly, Gomez was denied SSI benefits. Gomez requested further review by the Appeals Council. On September 5, 1989, the Appeals Council denied the request, finding that the ALJ's decision was based on substantial evidence. The ALJ's decision thus became final. Gomez then commenced this action appealing the Secretary's ruling on November 3, 1989.

1. On October 25, 1985, while this reconsideration was pending, Gomez filed a second application for SSI benefits. This application was denied at all levels, but then vacated when the Secretary discovered that Gomez's 1984 application was still pending.

## II. *Merits.*

### A. *Procedural Error.*

■ The first issue in this appeal is whether the Appeals Council followed its own procedures in upholding the ALJ's denial of SSI benefits to Gomez. Gomez asserts that the Appeals Council erred in denying his request for review without first considering the testimonial evidence elicited during his hearing before the ALJ. This issue first came to light when Gomez sought discovery on whether members of the Appeals Council considering his case actually reviewed the transcript of his hearing before the ALJ. The Secretary filed a motion for protective order, arguing that discovery of this extra-record information was improper. The dispute was referred to a magistrate, who denied the motion for protective order, concluding that information focusing on the Secretary's procedural compliance was relevant and material. The court then affirmed the magistrate's ruling on the Secretary's motion for reconsideration.

The Secretary's response to Gomez's discovery requests indicates the truly limited circumstances in which the Appeals Council reviews the transcript of the hearing below. There are four circumstances in which the Appeals Council or its staff will review a tape or transcript: (1) when there was expert medical or vocational testimony during the hearing, (2) when the claimant alleges that the hearing was unfair, (3) when the Appeals Council is considering reviewing the decision on its own motion, or (4) when the Appeals Council is considering granting review and issuing a decision not wholly favorable to the claimant.[2] Thus, in cases such as Gomez's, where the claimant's request for review is denied and there has been no expert testimony or allegation of an unfair hearing, the Appeals Council does not review the transcript or tape of the hearing before the ALJ. Go-

2. These are the only circumstances in which a full audit of the hearing record is required. An analyst for the Appeals Council may also audit a tape of the hearing if he or she has reason to believe that the tape contains information having a substantial bearing on the matter before the Appeals Council.

mez argues that this procedure is in direct violation of the Secretary's own regulations for Appeals Council review.

Gomez's argument overlooks the distinction between an Appeals Council decision denying further review and one granting review but affirming the ALJ's decision. Social Security regulations provide that "[t]he Appeals Council may deny a party's request for review or it may decide to review a case and make a decision." 20 C.F.R. § 416.1481 (1990). Section 416.-1470(a) of the regulations sets out the four circumstances in which the Appeals Council will review a case and enter a decision:

(a) The Appeals Council will review a case if—

(1) There appears to be an abuse of discretion by the administrative law judge;

(2) There is an error of law;

(3) The action, findings or conclusions of the administrative law judge are not supported by substantial evidence; or

(4) There is a broad policy or procedural issue that may affect the general public interest.

*Id.* § 416.1470(a) (1990). Once the Appeals Council decides to review a case under one of the above circumstances, § 416.1470(b) through § 416.1481 define the procedures by which it exercises that review. For example, § 416.1470(b) addresses the circumstances in which the Appeals Council must consider new evidence. It states that, on an application for review other than one based on application for benefits, the Appeals Council must review all the evidence in the record, including new evidence submitted with the request for review. *Id.* § 416.1470(b). Likewise, § 416.1479 describes the range of actions that the Appeals Council may take when it reviews a case. It requires the Appeals Council to review the complete record, including the transcript of the hearing before the ALJ, before making its decision.

■ Gomez argues that both of these provisions, § 416.1470(b) and § 416.1479,

support his argument that the Appeals Council erred by not looking at the transcript of the hearing before denying his request for further review. His reliance is misplaced. Both sections require transcript examination only when the Appeals Council has decided to exercise full review under one of the circumstances listed in § 416.1470(a), not in denying a request for review. Here, the Appeals Council declined further review, finding that the ALJ's decision was supported by substantial evidence. Therefore, neither provision is implicated.[3]

■ The question remains, however, whether there is any implicit requirement that the Appeals Council review the record of a claimant's hearing before declining further review. As applied to this case, the regulations provide only that the Appeals Council will review the ALJ's decision if "[t]he action, findings or conclusion of the administrative law judge are not supported by substantial evidence." *Id.* § 416.1470(a)(3). There are no regulations which describe how, at this initial stage of the appellate process, the Appeals Council determines whether there is "substantial evidence," nor is there any explicit requirement that the transcript or tape of the hearing be reviewed at this point.

Nevertheless, it is beyond cavil that the Appeals Council can conclude that there is substantial documentary evidence to support a decision without undertaking some sort of cursory evaluation of the testimony elicited during the hearing before the ALJ. The Appeals Council's policy to review hearing transcripts in benefits determination cases only when there has been expert testimony or an allegation of an unfair hearing reflects an inherent distrust of the testimony of the claimant and his or her non-expert witnesses. A claimant's testimony, and the testimony of others familiar with his or her condition, can be vitally important in establishing factors critical to a finding of disability, such as elements of a listed impairment or the existence of sig-

---

**3.** Furthermore, the relevant language in § 416.1470(b), requiring the Appeals Council to "evaluate the entire record," does not apply to a

request for review of a decision denying an application for benefits, like Mr. Gomez's, that does not involve new evidence.

nificant nonexertional limitations on the ability to work. Often, the only way to establish the frequency and severity of such conditions is through this testimony.[4] Thus, implicit in the language of § 416.1470(a)(3) that the ALJ's decision be supported by substantial evidence is the requirement that the Appeals Council inform itself as to the universe of that evidence. It is impossible for the Appeals Council to conclude that a decision denying benefits is supported by substantial evidence without even looking at the extent and content of the hearing testimony.

Accordingly, I conclude that the Appeals Council erred procedurally in denying further review to Gomez without addressing the testimony contained in the hearing transcript. In such a situation, normally the court will remand the case to the Secretary for reconsideration under the correct procedure. However, " 'remand for immediate award of benefits is appropriate when additional fact finding would serve no useful purpose.' " *Sorenson v. Bowen*, 888 F.2d 706, 713 (10th Cir.1989) (citation omitted). As I have outlined below, the record fully supports a determination that Gomez is entitled to benefits. Remand for reconsideration would serve no useful purpose. Gomez first requested benefits in 1984. Any further delay in awarding them to him would be unconscionable.

### B. *Denial of Benefits.*

■ Gomez's second argument in this appeal is that the Secretary's decision denying him benefits was not supported by substantial evidence. Gomez raises four issues in connection with this argument: (1) whether his impairments met or equalled the listings for epilepsy contained in the Social Security regulations, (2) whether the ALJ gave sufficient weight to Gomez's testimony as to the frequency and severity of his seizures, (3) whether the ALJ gave adequate consideration to Gomez's nonexertional limitations related to his seizure disorder and alcohol abuse, and (4) whether the ALJ properly discounted the opinion of Gomez's treating physician. These arguments have merit.

In an appeal from a final decision of the Secretary denying SSI benefits, I must uphold the Secretary's decision if it is supported by substantial evidence. *Diaz v. Secretary of Health & Human Servs.*, 898 F.2d 774, 776 (10th Cir.1990). "The determination of whether substantial evidence supports the Secretary's decision is not simply a 'quantitative exercise,' for evidence is not substantial if it is overwhelmed by other evidence or if it really constitutes mere conclusion." *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir.1989). Substantial evidence requires "more than a scintilla, but less than a preponderance," *id.*, and is defined as " 'sufficient relevant evidence in the record that a reasonable person might deem adequate to support the ultimate conclusion.' " *Potter v. Secretary of Health & Human Servs.*, 905 F.2d 1346, 1348 (10th Cir.1990) (citation omitted).

The Secretary follows a sequential, five-step process in determining eligibility for benefits. *See, e.g., Sorenson v. Bowen*, 888 F.2d at 710 (outlining steps). During the first through fourth steps, the claimant bears the burden of proof that he has a disability that prevents him from engaging in his prior work activity. *Id.* " 'Once the claimant has established a disability, the burden shifts to the Secretary to show that the claimant retains the ability to do other work activity and that jobs the claimant could perform exist in the national economy' " under the fifth step. *Id.* (citing *Ray*

---

**4.** For example, the listing for convulsive disorders applicable to this case clearly acknowledges the need to rely on third-party testimony. To establish disability based on a convulsive disorder, the listing requires

> at least one detailed description of a typical seizure ... [which] includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information. *Testimony of persons other than the claimant is essential for the description of type and frequency of seizures if professional observation is not available.*

20 C.F.R. Part 404, Subpt. P, App. 1. Sec. 11.00 (1990).

*v. Bowen,* 865 F.2d at 224); *see also Diaz,* 898 F.2d at 776. In reviewing the Secretary's decision, I "meticulously examine the record and view it in its entirety." *Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir.1988).

Gomez claims that he is disabled by the combination of three impairments: a seizure disorder, alcoholism and a shoulder injury. His appeal to this court focuses on the limited consideration the ALJ gave to the effect of his seizure disorder on his ability to work. In his order denying benefits, the ALJ stated:

> The medical evidence indicates that the claimant has a long-standing seizure disorder. However, for most of the last eighteen years, his condition has been well controlled by medication and he has had very rare grand mal seizures (Exhibits 19, 20, 21, 23 and B-42). Although the claimant's wife and acquaintances allege that the claimant has several seizures per week, he has not been hospitalized repeatedly as a result of these seizures and there is simply no adequate documentation to support a finding that he has seizures of either the grand mal or petti [sic] mal type more than once every few months (Exhibits B-43—B-48). Certainly, the claimant's seizures have not occurred with the frequency required by the Listings and the claimant has no significant residuals between seizures. Neurologic evaluation of the claimant in recent years has been within normal limits and electroencephalograms have been negative (Exhibits 25 and 26). Notes from the claimant's physicians made after episodes of alleged seizures indicate that no true seizure activity is present (Exhibit B-38).

Record at 10. Gomez argues, and I agree, that the record belies nearly every finding made by the ALJ in concluding that Go-

mez's seizure disorder does not meet or equal a listed impairment.[5]

In considering the applicability of the listings relevant to seizure disorders, the ALJ first concluded that, although Gomez has a documented seizure disorder, it was well controlled by medication. The ALJ relied on Exhibits 19, 20, 21, 23 and B-42, which were hospital and medical reports from 1976, 1980 and 1981 and statements in the notes of two physicians from 1985. In doing so, the ALJ selectively listed the few instances in which the medical records reflected that Gomez's seizures were controlled by his medication. At least an equal number of entries during this time period reflected that Gomez continued to have regular seizures despite his medication. *See, e.g.,* Record at 181 ("Seizure disorder, etiology unknown, with recurrent seizures despite current medical therapy"); *id.* at 233 (noting that seizure disorder is uncontrolled); *id.* at 241 ("continues to have seizures on a regular basis"); *id.* at 253 (seizures poorly controlled). Furthermore, the ALJ misrepresents the content of two of these exhibits. In Exhibit 23, although Dr. Fouts stated that Gomez had "done better" since put on phenobarbital, he nevertheless indicated that the seizures still occurred once a month and increased with physical activity. *Id.* at 243. Likewise, in Exhibit B-42, Dr. Thomas noted in one instance that Gomez's seizures were "fairly well controlled" by his medication, *id.* at 502, but the bulk of his comments are directed to Gomez's apparent control of his *alcoholism,* which correspondingly helped to decrease his seizures. *Id.* at 497, 503.

More importantly, the most recent evidence in the record, dating from 1985 forward, indicates that Gomez's seizures have not been controlled by his medication. The most persuasive evidence on this point is a

---

**5.** Section 11.03 of the Listings for neurological impairments describes the conditions which must be present for a finding of disability based on epilepsy with minor motor seizures:

> 11.03 *Epilepsy—Minor motor seizures (petit mal, psychomotor, or focal), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once*

*weekly in spite of at least 3 months of prescribed treatment.* With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Part 404, Subpt. P, App. 1, Sec. 11.03 (1990).

September 1, 1987 medical report from Dr. Steinberg, describing Gomez's admission to a clinic on that date. In the report, Dr. Steinberg states:

> This patient was admitted through the clinic after experiencing several tonic/clonic seizures in a row this morning. The patient is 43 years old and has a history of epilepsy since age 7. He has had frequent episodes of uncontrolled seizures, last episode was several months ago. His wife is not sure when he was last hospitalized. He was previously treated by Dr. H. Dale Thomas and apparently has had a complete neurological workup several times in the past. His wife states that he was drinking last night, had his usual 1 to 2 to 3 beers. After this he had several episodes of emesis [sic] was noted to have spots of blood in the emesis. This morning at 7:30 he woke up. Had a tonic/clonic seizure. This was followed quickly thereafter by four others. When he arrived in the clinic with his friends, controlling his motor activity he was in an active tonic/clonic seizure. This was easily controlled with I.V. Valium 6mg. The patient's present medications include Dilantin 300 mg po q.h.s., Phenobarbital 100mg po q.h.s. and Tranxene 7.5mg q.h.s. His wife states that he has taken his medication on a regular bases [sic] and she gave him a double dose of Dilantin this morning when he started to have seizures.

*Id.* at 478. Lab tests performed on Gomez during this admission indicated that his dilantin and phenobarbital were in the therapeutic range, yet he still suffered from seizures. *Id.* at 478–79; *see also id.* at 192 (medical record from 1976 indicating that Gomez had a seizure while being admitted, despite having taken his drugs). The clear weight of the evidence is that, contrary to the ALJ's conclusions, Gomez's seizures were not controlled by his daily medication.

In addition to evidence that Gomez's medication was not successful in controlling his disorder, there are repeated indications that Gomez's has a serious problem with alcoholism. *See, e.g.,* Record at 427, 435, 436, 437, 453, 454, 465, 467, 468, 480, 487, 491. The listing for neurological impairments requires that "[w]here documentation shows that use of alcohol or drugs affects adherence to prescribed therapy or may play a part in the precipitation of seizures, this must also be considered in the overall assessment of impairment level." 20 C.F.R. Part 404, Subpt. P, App. 1, Sec. 11.00(A). Here, the ALJ disregarded Gomez's alcoholism as a factor in his disability, finding that "the medical evidence and testimony at the hearing suggest that the claimant has been able to control his drinking in recent years and that he does not have a significant problem with intoxication at this time." Record at 13.

This finding is clearly erroneous in light of the pervasive evidence in the record that Gomez has a longstanding and unchecked history of alcohol abuse continuing up to the time of his hearing before the ALJ. *See, e.g., id.* at 452–53 (January 22, 1988 medical report indicating poor prognosis for recovery from alcoholism); *id.* at 468 (May 26, 1988 reexamination report indicating chronic alcoholism); *id.* at 491 (hospital record dated July 25, 1988, one day before the hearing, noting that Gomez had alcohol on his breath when examined). The ALJ's decision to accept as credible Gomez's testimony that he had controlled his alcoholism, but to reject as unreliable his statements as to his seizure condition, is perplexing. Alcoholism is a disease characterized by denial. The overwhelming documentary evidence shows that Gomez has never been successful in controlling this disease. The ALJ did not adequately consider the profound effect that Gomez's alcoholism has on his ability to manage his seizure disorder.

The ALJ next found that there was inadequate evidence to support Gomez's claims as to the frequency of his seizures or that he suffered any significant post-seizure residuals. Again, the record belies this finding. In an affidavit provided by Mrs. Gomez at the hearing, Mrs. Gomez outlined the dates on which Gomez suffered either mild or strong seizures for the months of January through July, 1988. During this period, Gomez averaged over seven sei-

zures per month. *Id.* at 513–14. Both she and Gomez testified during the hearing that Gomez is weak, tired and sleepy for several days after a seizure. *Id.* at 50, 58. Mrs. Gomez added that Gomez is unable to go the bathroom by himself due to weakness. *Id.* at 58. Other evidence, including medical records, confirms that Gomez does indeed suffer from fairly significant post-seizure residuals. *See, e.g., id.* at 243 (symptoms consistent with postictal state); *id.* at 427 ("prolonged postictal state of confusion and drowsiness"); *id.* at 463 (Gomez unable to walk without assistance for one-half to one hour after seizure).

■ The ALJ discounted the testimony of Gomez's wife and acquaintances because there was no evidence that Gomez had been hospitalized repeatedly because of the seizures. Aside from abundant evidence to the contrary, as I noted in *Hockenhull v. Bowen*, 723 F.Supp. 555, 557 (D.Colo.1989), the failure to seek medical attention for a condition is of little probative value in assessing credibility when the claimant cannot afford treatment and there is no indication that medical services would be particularly beneficial. There is no dispute that the Gomez's have few financial resources. Gomez does not drive and his wife is disabled. Gomez cannot be expected to seek medical attention for seizures occurring up to several times a week when he has few resources to pay for treatment and the care provided differs little from what he receives at home.

The ALJ's final comment in addressing Gomez's seizure disorder was that "[n]eurologic evaluation of the claimant in recent years has been within normal limits ... electroencephalograms have been negative [and] [n]otes from the claimant's physicians made after episodes of alleged seizures indicate that no true seizure activity is present." Record at 10. The ALJ again engages in selective review of the record. Of the four EEG results provided, the most recent occurred in 1985 and was within the normal range. *See id.* at 257, 441. How-

ever, in the three other EEGs, problems were noted. The first, conducted on January 26, 1976, was described as "borderline." *Id.* at 181. The second, dated June 2, 1976, was normal but described as "poorly organized." *Id.* at 200. Finally, an EEG made on January 8, 1981 was found to be abnormal due to "right axis deviation, possible left ventricular hypertrophy and nonspecific wave abnormality." *Id.* at 262. Furthermore, the ALJ's reliance on the physician's notation in Exhibit B–38 that "no true seizure activity [was] noted" to express skepticism as to Gomez's seizure condition is unfounded. This notation is outweighed by the same physician's diagnosis of seizure disorder, other medical reports spanning a twelve-year period making this diagnosis, and the fact that, on at least two occasions, Gomez was stricken with a seizure while hospitalized.

Consequently, I conclude that the Secretary's decision denying Gomez benefits is not supported by substantial evidence, but flies in the face of it. Gomez's symptoms meet or equal the listing for epilepsy with minor motor seizures,[6] and he is presumptively disabled. Even assuming that there is insufficient evidence to show that Gomez's condition meets this listing, his combination of impairments renders him disabled. Gomez has significant non-exertional limitations on his ability to work. He suffers from regular seizures, despite medication, which are exacerbated by his uncontrolled alcoholism. The Secretary has not demonstrated that he can perform any tasks on a regular, consistent basis. *See Williams v. Bowen*, 844 F.2d at 757–760 (Secretary erred in applying grids and discounting severity of claimant's nonexertional limitations arising from alcoholism and seizures).

The Secretary's decision is REVERSED and the case is REMANDED for an immediate award of benefits to Mr. Gomez.

---

**6.** His disorder is documented by at least one abnormal EEG, numerous and complete descriptions of his typical seizure pattern, (which includes a loss or alteration of consciousness and postictal phenomena), and seizures occurring more than once a week despite at least three months of treatment. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, Sec. 11.03.