**Robert L. AKERS, Plaintiff,**

v.

**John J. CALLAHAN, Acting Commissioner of Social Security, Defendant.**

**No. Civ.A. 97–447.**

United States District Court, W.D. Pennsylvania.

Feb. 25, 1998.

Joseph E. Fieschko, Jr., Pittsburgh, PA, for Plaintiff.

Ryan R. Kennedy, Pittsburgh, PA, for Defendant.

## MEMORANDUM OPINION

LEE, District Judge.

### I. INTRODUCTION

Plaintiff Robert L. Akers brings this action pursuant to 42 U.S.C. §§ 405(g) seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying his application pursuant to the Social Security Act ("Act") for supplemental security income ("SSI").[1] As is the customary practice in the Western District of Pennsylvania, the parties have submitted cross motions for summary judgment and the record developed at the administrative proceedings, including post hearing submissions of medical reports and documents.

After careful consideration of the Administrative Law Judge's ("ALJ") Adjudication, the memoranda of the parties, and the entire record, the Court finds the record offers almost no support for any of the ALJ's important findings or his conclusions, and, conversely, offers *compelling* support for plaintiff's disability based upon a combination of severe impairments, chief of which are an uncontrolled seizure disorder, a long-standing condition of bipolar disorder with panic attacks, and a long-standing peptic ulcer condition. Accordingly, summary judgment will

---

1. Social Security Amendments of 1972, Pub.L. No. 92–603, §§ 1601–34, 86 Stat. 1465–93 (codi- fied as· amended at 42 U.S.C. §§ 1381–1383d).

be entered in plaintiff's favor and an award of SSI benefits will be ordered.

## II. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance on August 24, 1992, alleging that he was disabled at that time because of ulcers and anxiety. His application was denied initially by the Social Security Administration, and denied again on his application for reconsideration. A hearing was conducted before an ALJ on December 14, 1994. Plaintiff, represented by counsel, testified at the hearing, as did his wife, Vicky Akers, and introduced numerous medical reports and other medical documents. The testimony and the medical evidence adduced at and submitted following the hearing concerned not only Mr. Akers' ulcers and anxiety, but also expanded the mental impairments (anxiety) claim to other emotional and psychological problems, including bipolar disorder, and the physical impairments (ulcers) claim to a seizure disorder which commenced sometime *after* his application form was filed. (He first received in-patient hospital treatment for his seizures in June, 1993.) Vocational expert Noel Plummer, Ph.D. also appeared and responded to a series of hypothetical questions posed by the ALJ.

By adjudication dated April 16, 1996, the ALJ denied plaintiff's disability claim, and the Appeals Council upheld the ALJ's adjudication, which thus became the final decision of the Commissioner.

## III. STATEMENT OF THE CASE

### ALJ's Findings of Fact

The ALJ made the following Findings:

1. The claimant has not engaged in substantial gainful activity since July 24, 1992.

2. The medical evidence establishes that the claimant has a seizure disorder, disc bulge, right shoulder impairment, headaches, depression and an ulcer, impairments which are severe but do not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

3. The claimant's statements concerning his impairments and their impact on his ability to work are not entirely credible in light of discrepancies between the claimant's assertions and information contained in the documentary reports and the findings made on examination.

4. The claimant lacks the residual functional capacity to climb or balance and can only occasionally crouch, stoop, kneel, or crawl, cannot interact appropriately with co-workers or supervisors, concentrate on or attend to work tasks on a sustained basis, tolerate more than minimal levels of stress and cannot work around environmental hazards.

5. The claimant is unable to perform his past relevant work as laborer/grinder and carpenter.

6. The claimant's capacity for the full range of light work is diminished by the above set forth limitations.

7. The claimant is 44 years old, a "younger individual age 18 – 44."

8. The claimant has a high school education.

9. The claimant has skilled work experience.

10. Based on an exertional capacity for light work, and the claimant's age, education background, and work experience, Section 416.969 and Rules 202.21 and 202.22, Table No. 2, Appendix 2, Subpart P, Regulations No. 4, would direct a conclusion of "not disabled." The same result would be reached without regard to transferability of work skills.

11. Although the claimant's additional nonexertional limitations do not allow him to perform the full range of light work, using the above-cited Rule as a framework for decision-making, there are a significant number of jobs in the national economy which he could perform. Examples of such jobs are: work as an assembly worker, dispatcher and packager. Tens of thou-

sands of jobs in each of these categories exist in the national economy.

12. The claimant has not been under a disability, as defined in the Social Security Act, at any time through the date of this decision.

Adjudication, R. 23–24.

Accordingly, the ALJ concluded plaintiff was not eligible for SSI benefits. In his discussion, the ALJ discounted plaintiff's credibility as to the frequency and severity of his seizures and his psychological impairments based in part on perceived "discrepancies" inherent in his testimony and as compared to that of his wife, and purported to have considered all of the medical evidence and listed some reasons for crediting certain medical evidence over other. In reviewing the medical records, however, it is apparent the ALJ failed to give adequate consideration to the treating physician's diagnosis and opinions and chose to selectively credit certain portions of certain physician's opinions and records without principled reason for ignoring other portions which support plaintiff's disability. It is also apparent that the ALJ's hypothetical questions and the answers thereto not only fail to support the ALJ's conclusions and findings, but actually support a finding of disability, and that the perceived "discrepancies" in plaintiff's testimony were highly exaggerated and evaporate when placed in obvious context.

## IV. STANDARDS OF REVIEW

 Because the standards for eligibility under Title II and judicial review thereof are virtually identical to the standards under Title XVI, decisions rendered under 42 U.S.C. § 423 are also applicable to decisions rendered under 42 U.S.C. § 1381a. *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). The Act limits judicial review of the Commissioner's final decision on disability claims. 42 U.S.C. §§ 405(g)[2] and 1383(c)(3.).[3] Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based. If supported by substantial evidence, the Commissioner's factual findings of disability must be accepted as conclusive. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995); *Wallace v. Secretary of HHS*, 722 F.2d 1150, 1152 (3d Cir.1983).

 The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It consists of more than a scintilla of evidence, but less than a preponderance. *Ventura*, 55 F.3d at 901 (*quoting Richardson*, 402 U.S. at 401); *Stunkard v. Secretary of HHS*, 841 F.2d 57, 59 (3d Cir. 1988). The substantial evidence standard allows a court to review a decision of an ALJ, yet avoid interference with the administrative responsibilities of the Commissioner. *See Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir.1983).

In *Claussen v. Chater*, 950 F.Supp. 1287, 1292 (D.N.J.1996), the district court set forth the following principles of review of the Commissioner's/ALJ's adjudication:

Reasonable minds can reach different conclusions following review of the evidentiary record upon which the Commissioner's decision is based. Nevertheless, in such cases, a district court's function is to determine whether the record, *as a whole*, contains substantial evidence to support the Commissioner's findings. *See Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir.1994) (*citing Richardson*, 402 U.S. at 401, 91 S.Ct. at 1427). A court may not displace an administrative body's " 'choice between two fairly conflicting views, even though the court would justifiably have made a

**2.** Section 405(g) provides in pertinent part:
Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action....
42 U.S.C. § 405(g).

**3.** Section 1383(c)(3) provides in pertinent part:

The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.
42 U.S.C. § 1383(c)(3).

different choice had the matter been before it de novo.' " (citations omitted)

Nonetheless, an ALJ is expected to do more than simply state factual conclusions. *See Stewart*, 714 F.2d at 290. Rather, the ALJ must make specific findings of fact to support his or her ultimate findings. *Id. The ALJ must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence, especially when testimony of the claimant's treating physician is rejected.* *See Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir.1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981). He or she must also give serious consideration to the claimant's subjective complaints of pain, even when those assertions are not confirmed fully by objective medical evidence. *See Mason v. Shalala*, 994 F.2d 1058, 1067–68 (3d Cir. 1993); *Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir.1986).

An ALJ, however, is not obliged to accept without question the credibility of such subjective evidence. *See Marcus v. Califano*, 615 F.2d 23, 27 (2nd Cir.1979). An ALJ has discretion " 'to evaluate the credibility of a claimant and to arrive at an independent judgment in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.' " *LaCorte v. Bowen*, 678 F.Supp. 80, 83 (D.N.J.1988) (*quoting Brown v. Schweiker*, 562 F.Supp. 284, 287 (E.D.Pa. 1983)). *If an ALJ concludes testimony is not credible, however, the basis for such a conclusion must be indicated in his or her decision. See Cotter*, 642 F.2d at 705. (emphasis added).

When resolving the issue of whether a claimant is disabled and whether the claimant is entitled to disability insurance or SSI benefits, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). *See Sullivan*, 493 U.S. at 525. In summary, this process requires the Commissioner and the ALJ to consider, in sequence, whether a claimant (1) is working (currently engaged in substantial gainful employment); (2) has a medically demonstrable severe impairment; (3) has an impairment that meets or equals the requirements of a "listed" impairment, i.e., one which the Commissioner has listed as a substantial-enough impairment to conclusively presume disability. "For a claimant to show that his impairment matches a listing, it must meet *all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley*, 493 U.S. at 530 (emphasis added); (4) if step 3 is negative, i.e., the claimant does not have a listed impairment or its equivalent, whether the claimant can return to his or her past relevant work; and (5) if not, whether he or she can perform other work available in the national economy. *Id.; Welch v. Heckler*, 808 F.2d 264, 268–69 (3d Cir.1986).[4]

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir.1987); 42 U.S.C. § 423(d)(1) (1982). This may be done in two ways:

(1) Steps 1–3—by introducing medical evidence that the claimant is disabled *per se* because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1. *See Heckler v. Campbell*, 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777; or,

(2) Steps 1–4—in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423(d)(2)(A)).

In order to prove disability under the second method, Plaintiff must first demon-

---

4. For a thorough and more detailed explanation of the five-step evaluation process, *see Claussen*, 950 F.Supp. at 1293–94.

strate the existence of a medically determinable disability that precludes him or her from returning to his or her former job. *Stunkard,* 841 F.2d at 59; *Kangas,* 823 F.2d at 777. Once it is shown that he or she is unable to resume his or her previous employment, the burden shifts to the Commissioner at Step 5 to prove, that, given Plaintiff's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Stunkard,* 841 F.2d at 59; *Kangas,* 823 F.2d at 777; *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano,* 602 F.2d 55, 57 (3d Cir.1979).

## V. DISCUSSION

The ALJ's determination, accepted by the Commissioner, is fraught with instances where medical factoids, selective excerpts and unwarranted inferences from medical reports and documents are taken out of context, other medical evidence is ignored for no apparent reason, credibility determinations are rendered against the plaintiff based upon questionable inferences and immaterial or easily explainable "discrepancies," and patently flawed hypothetical questions to the vocational expert are used to deny disability benefits. The following are *some* of the more glaring instances of unsupported findings and flawed reasoning which will suffice to demonstrate the ALJ's determination is without substantial evidence.

### 1. Disregard of Competent, Uncontradicted Medical Evidence

#### (A) Listing 11.03—Minor Motor Seizures

Listed neurological impairments set forth in Listing 11.00, Appendix 1, include:

**A. Convulsive disorders.** In convulsive disorders, regardless of etiology degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures. *At least one detailed description of a typical seizure is required.* Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information. Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

*Documentation of epilepsy should include at least one electroencephalogram (EEG).*

Under 11.02 and 11.03, the criteria can be applied *only if the impairment persists despite the fact that the individual is following prescribed anticonvulsive treatment.* Adherence to prescribed anticonvulsive therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy.... Where documentation shows that use of alcohol or drugs affects adherence to prescribed therapy or may play a part in the precipitation of seizures, this must also be considered in the overall assessment of impairment level.

20 C.F.R. Part 404, Subpt. P, Appendix 1, § 11.00 (emphasis added).

Categories of neurological impairments include § 11.02 Epilepsy—major motor seizures, (grand mal or psychomotor), and

**11.03 Epilepsy–Minor motor seizures (petit mal, psychomotor, or focal),** documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring *more frequently than once weekly* in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Part 404, Subpt. P, § 11.03 (emphasis added).

■ The ALJ disregarded essentially *uncontradicted* medical evidence that demonstrates plaintiff easily meets this listed impairment. His primary treating physician, Dr. John B. Martin, Jr., M.D., an internist, treated plaintiff for a variety of serious ailments for many years, including treatment for chronic peptic ulcers related to serious

multiple abdominal surgeries when plaintiff was in his late teens. Dr. Martin was administering to plaintiff in June, 1993, when, while hospitalized at Brownsville General Hospital for acute viral syndrome, he experienced convulsions and grand mal seizures which abated at that time without treatment. Exhibit 17, R. 214–18. A series of EEGs were administered during that hospitalization from June 6–9, 1993, and each indicated "Abnormal EEG ... Sinus Bradycardia with First Degree AV Block." Exhibit 17, R. 225–29. *The ALJ failed to mention the "Abnormal EEGs"* in his determination.

Plaintiff continued to experience seizures after his discharge, and the record contains documentation of several emergency room visits between June 1993, and December 14, 1994, for seizures of varying severity, followed by severe headaches. These documents consistently record "abnormal EEGs" throughout this time frame, *which the ALJ failed to mention.* Plaintiff's contemporaneous subjective history upon admissions was that he was experiencing one to several "little seizures" a week prior to each emergency hospitalization. Plaintiff's seizures ebbed and flowed somewhat throughout this period as adjustments were made to his medications. Some of Dr. Martin's office progress notes indicate no seizures for certain periods in between office visits, but nevertheless, show a consistent pattern of minor motor seizures that was not controlled despite treatment with several medications, including Dilantin which went from a dose of 200 mg. to one of 400 mg.

There is no need to go into great detail on each incident. For present purposes, it will suffice to skip to the most recent hospitalization for seizures on the record, and Dr. Martin's discharge summary. Exhibit 30, Post Hearing Submission of Medical Records from Brownsville General Hospital dated June 6, 1993 through February 19, 1994, R. 326–423. Dr. Martin's "final diagnosis" of February 1, 1995, concerning plaintiff's emergency room admission of December 19, 1994, was (1) "seizure disorder uncontrolled on admission;"

(2) "bipolar affective disorder;" and (3) "migraine headaches." R. 326. Again, his EEG was "abnormal," showing "sinus rhythm with first degree AV block." R. 328, R. 366–68. Dr. Martin admitted plaintiff to the hospital on December 19, 1994, having observed him at his office "trembling all over and feeling strange, and was obviously having seizures, not controlled on his current dose of Dilantin." R. 328. As confirmed by the EEGs, Dr. Martin believed plaintiff was "having seizures, acute grand mal seizures, at the time of admission." R. 328.

Dr. Martin referred plaintiff to a neurologist, Dr. Shoba Asthana on December 21, 1994, who confirmed Dr. Martin's diagnosis of seizure disorder, describing his impressions from patient's history and examination as "aura of feeling of warmth, dizziness and diaphoresis progressing to a loss of consciousness followed by generalized tonic-clonic activity rais[ing] concerns for convulsive syncope rather than primary seizure disorder. The patient's EKG [sic] is showing sinus bradycardia with heart rate dropping down into 50's at times." R. 341.[5]

Every time plaintiff went to a consulting physician or to an agency "evaluator," the evaluator confirmed Dr. Martin's diagnosis that plaintiff was suffering from seizures, and he consistently told each physician he was experiencing two or three seizures a week. *E .g.* Dr. Hahn, Exhibit 20, R. 288; Dr. Zubchevich, Exhibit 28, R. 320. Although the ALJ *mentioned* all of the various physicians who had treated or evaluated plaintiff, he *ignored* the virtually unanimous opinions of the medical professionals that the patient suffered from recurring petit mal and occasional grand mal seizures that were uncontrolled by medication.

The ALJ seems to have been unduly impressed by several medical factoids of questionable significance and an exceptionally unwarranted inference from one physician's notes. The ALJ mentioned plaintiff's "normal brain scans" on several occasions. R. 17–18. These "normal" brain scans did not prevent every medical professional reviewing

---

5. A "tonic-clonic seizure" is a spasm consisting of convulsive twitching of the muscles, and it characterizes a grand mal seizure, along with loss of consciousness. Dorland's Illustrated Medical Dictionary 567, 1719 (28th ed.1994).

the case or treating plaintiff from concluding he suffered a seizure disorder, nor is there any medical evidence that normal brain scans somehow "trump" or disprove abnormal EEG readings or the fact that medical professionals witnessed plaintiff undergoing grand mal and petit seizures and treated him for that condition.

The ALJ's primary reason for rejecting the unanimous opinions of the medical professionals who treated or evaluated plaintiff seems to be an inference he takes from an innocuous item in Dr. R.K. Mehta's progress notes from July 7, 1993. Dr. Mehta, a psychiatrist referred by Dr. Martin to treat plaintiff for depression and anxiety, states at one point that plaintiff is "getting treatment for his 'seizure' disorder." Exhibit 31, R. 424. Dr. Mehta's opinion as of April 26, 1993, *prior to the onset of plaintiff's seizures,* was that plaintiff "should be able to clean, shop," etc., and had no real desire or "motivation to change." R. 211–12, Exhibit 16. Apparently Dr. Mehta's putting the word "seizure" in quotes, coupled with the earlier report, convinced the ALJ to completely discount the *overwhelming medical evidence* demonstrating plaintiffs minor motor seizure condition which satisfies all of the requirements for a listed impairment, namely § 11.03 of the Listings.

From his reports, the ALJ concluded that Dr. Mehta "seems to have doubts about a 'seizure disorder' and believes the claimant needs retraining to 'work a job,'" R. 19, and "that the claimant has a questionable seizure disorder." R. 17. Dr. Mehta was referred by Dr. Martin in order to evaluate and treat plaintiff for psychological, not neurological problems. Moreover, this Court finds *nothing* in Dr. Mehta's reports that indicate his belief that plaintiff's seizure disorder is "questionable" in the sense that it might not exist, or that directly contradicts the treating and consulting physicians' diagnosis of seizures uncontrolled by medication for the period from June 1993 through December 1994.

An ALJ is not permitted to make speculative inferences from medical reports, *Smith v. Califano,* 637 F.2d at 972, yet this is exactly what happened here. The ALJ disregarded his obligation to consider *all*

*medical evidence in the record* and provide *adequate explanations* for disregarding or rejecting evidence, especially when testimony of the claimant's treating physician is rejected. *Wier on Behalf of Wier v. Heckler,* 734 F.2d 955, 961 (3d Cir.1984); *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir.1981). Furthermore, a "single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala,* 994 F.2d 1058, 1064 (3d Cir.1993) (emphasis added), *quoting Kent v.. Schweiker,* 710 F.2d 110, 114 (3d Cir.1983). The ALJ here has focused myopically on one or two pieces of "information," not really amounting to "evidence," to support his conclusion that plaintiff's seizure disorder is "questionable."

The *whole record* demonstrates there is *nothing questionable* about Mr. Akers' seizure disorder, which satisfies the prerequisites for finding an impairment listed in Appendix 1, section 11.03, 20 C.F.R. Part 404, Subpt. P. Appendix 1, § 11.03, Minor Motor Seizures. *See e.g., Flanery v. Chater,* 112 F.3d 346 (8th Cir.1997) (finding that ALJ improperly discounted claimant's subjective history of frequency and severity of seizures, and disregarded medical evidence that uniformly demonstrated claimant's seizure disorder as a listed impairment; Court of Appeals remanded for an award of benefits, finding the medical reports and documents and testimony of record contains substantial evidence that plaintiff meets the listing, and that further hearings would merely delay benefits); *Smith v. Bowen,* 849 F.2d 1222 (9th Cir.1988) (same); *Orr v. Chater,* 956 F.Supp. 861 (N.D.Iowa 1997) (same); *Palmer v. Secretary of . HHS,* 1994 WL 814604 (W.D.Pa.1994) (Smith, J.; evidence of two or three petit mal seizures per week and occasional grand mal seizures would, if demonstrated, satisfy Listing 11.03, 20 C.F.R. §§ 404.1520(e), 416.920(e), resulting in an automatic determination of disability); *Gomez v. Sullivan,* 761 F.Supp. 746 (D.Colo.1991) (finding that ALJ improperly discounted claimant's subjective history of frequency and severity of seizures, and disregarded medical evidence that uniformly demonstrated claimant's seizure disorder as a listed

impairment; case remanded for "an immediate award of benefits"); *Steadman v. Heckler*, 612 F.Supp. 393 (W.D.Pa.1985) (same; "abnormal EEGs" supported seizure disorder diagnosis, medical evidence as a whole supported claimant's subjective account of his seizures, and that of family members, and required award of benefits). Plaintiff is thus entitled to receive SSI benefits from June 6, 1993, the first medically established instance of his seizure disorder.

### (B) Listing 12.04—Bipolar Disorder (Affective Disorder)

"Missing in action" from the ALJ's Adjudication of April 16, 1996, is any real discussion of plaintiff's uncontradicted diagnosis of bipolar disorder (manic-depression) affective, depressed with panic attacks. While he did find that plaintiff suffered from "depression" and purported to factor that into the combination of impairments as affecting plaintiff's ability to sustain gainful employment, there is precious little consideration of the effects of bipolar disorder with panic attacks, although there is certainly much medical evidence of record which supports such a *listed* impairment.[6] *See e.g., Overton v. Chater*, 1997 WL 88919 (E.D.Pa.1997) (substantial evidence did not support ALJ's determination that claimant could perform her previous work in light of the medical evidence of her

bipolar disorder); *Davis v. Secretary of HHS*, 1995 WL 351093 (M.D.Pa.1995) (it is "evident that the Secretary's finding that Davis' mental impairments did not meet the requirements for a Listed Impairment cannot be reconciled with the medical evidence of record."); *Farley v. Sullivan*, 1989 WL 35460 (E.D.Pa.1989) ("the record contains not one but several instances in which the ALJ at best failed to acknowledge or consider, and at worst ignored, medical evidence in the record" which demonstrated that claimant's bipolar condition prevented her from maintaining gainful employment; case remanded for speedy determination of onslaught date and award of benefits).

▪ Dr. Kennedy's psychiatric evaluation, Exhibit 15, R. 203–09, which the ALJ *specifically credited*, R. 21, contains Dr. Kennedy's narrative observations and Psychiatric Activities Assessment that indicate plaintiff fits well within the affective disorder listing of § 12.04. Dr. Kennedy's narrative includes that Mr. Akers gave up hunting and fishing, loves the Pittsburgh Steelers but can no longer even watch an entire game, exhibits erratic, violent behavior at times, suicidal behavior at others, sits around a lot, watches a lot of T.V., became extremely despondent after his brother was killed in a car accident in about 1988, and is often unable to resist

---

6. 20 C.F.R. Part 404, Subpt. P, Appendix 1, § 12.04 lists:

> **Affective Disorders:** Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
> A. Medically documented persistence, either continuous or intermittent, of one of the following: 1. Depressive syndrome characterized by at least four of the following:
> a. Anhedonia or pervasive loss of interest in almost all activities; or b. Appetite disturbance with change in weight; or c. Sleep disturbance; or d. Psychomotor agitation or retardation; or e. Decreased energy; or f. Feelings of guilt or worthlessness; or g. Difficulty concentrating or thinking; or h. Thoughts of suicide; or i. Hallucinations, delusions or paranoid thinking; or
> 2. Manic syndrome characterized by at least three of the following:
> a. Hyperactivity; or b. Pressure of speech; or c. Flight of ideas; or d. Inflated self-esteem; or e.

> Decreased need for sleep; or f. Easy distractibility; or g. Involvement in activities that have a high probability of painful consequences which are not recognized; or h. Hallucinations, delusions or paranoid thinking; or
> 3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
> AND
> B. Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or 4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).
> 20 C.F.R. Pt. 404, Subpt. P.

his impulses. The Psychiatric Activities Assessment indicates plaintiff cannot perform cleaning, shopping and other chores because his attention and frustration tolerance make it "impossible" to complete any task, that he cannot interact with anyone in authority because he would "likely quit in anger or possibly become physically combative," that he cannot focus his attention beyond a few minutes, even for activities he enjoys, and that he cannot "adhere regular attendance." R. 208–10.

The Court need not engage in exhaustive analysis of the medical record on plaintiff's bipolar disorder and the effect of that condition on his ability to secure and maintain gainful employment because the ALJ accepted Dr. Kennedy's psychiatric evaluation, including his diagnosis of December 4, 1992, that plaintiff suffers from bipolar disorder, depressed with panic attacks, and a borderline personality disorder, as well as Dr. Kennedy's psychiatric assessment. Moreover, the vocational expert, when asked to assume Dr. Kennedy's assessment was accurate, opined that plaintiff would not be able to maintain any gainful employment. Plaintiff's bipolar condition therefore qualifies as a listed impairment, rendering him eligible for SSI benefits as of December 4, 1992, the first medically determined assessment of disability from bipolar disorder.

### 2. Dubious Credibility Evaluations

As previously observed, "testimony of subjective pain and inability to perform even light work in entitled to great weight, particularly when ... it is supported by competent medical evidence." *Dobrowolsky v. Califano,* 606 F.2d 403, 409 (3d Cir.1979) Where a claimant's testimony as to pain is reasonably supported by medical evidence, neither the Commissioner nor the ALJ may discount a claimant's history of symptoms without contrary medical evidence. *Williams v. Sullivan,* 970 F.2d 1178, 1184–85 (3d Cir.1992), *cert. denied* 507 U.S. 924, 113 S.Ct. 1294, 122 L.Ed.2d 685 (1993); *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir. 1985); *Chrupcala v. Heckler,* 829 F.2d 1269, 1275–76 (3d Cir.1987). Similarly with complaints of seizures, blackouts, headaches,

fainting spells, etc., and other related debilitating conditions, a patient's report is an essential diagnostic tool which, if supported by medical evidence consistent with such symptoms, may not be discounted in the absence of contradictory medical evidence. *See Green v. Schweiker,* 749 F.2d 1066, 1070–71 (3d Cir.1984) (ALJ dismissed claimant's testimony about her history of frequent dizziness and blackout spells on ground that they were not "specifically reflected in the medical records. If complaints of dizziness are similar to complaints of pain, as they appear to be, dismissal of subjective symptomology on the basis of an absence of direct medical evidence is at odds with the Third Circuit standard, the new statute, and the Secretary's own regulations. [citations omitted] .... Thus while there must be objective medical evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself. Here, Green's objectively verified conditions, which included obesity, hypertension, angina, diabetes, and chest pains, could reasonably be said to produce dizziness and blackouts."); *Flanery v. Chater,* 112 F.3d at 350 (subjective testimony about history of frequency and severity of minor motor seizures was supported by other lay witnesses and doctor who had witnessed seizure, plus "abnormal" EEG test results, and should not have been discounted in the absence of medical evidence contradicting claimant's seizures).

Here, the ALJ gave several dubious reasons for discrediting plaintiff's testimony about the frequency and severity of his seizures and about his mental health based upon his perceptions of "discrepancies" inherent in plaintiff's testimony and between plaintiff's testimony and his wife's, discrepancies that are more imagined than real.

(1) The frequency and recovery time of plaintiff's seizures. The ALJ found plaintiff was not credible because "the claimant reported his seizures last from several minutes to an hour, but wife testified that they last one to four minutes." R. 18–19. Review of the *entire* transcript reveals that plaintiff's testimony was quite consistent with his wife's testimony about the frequency and severity of the seizures, and that there is no real

"discrepancy" as to the elapsed time of the seizures. It appears from the testimony of both plaintiff and his wife, and from the consistent medical observations and reports, that his actual seizures may last only several minutes but the debilitating "postictal" effects of the seizures last for much longer than that. Ms. Akers' testimony was that it would be "anywhere from a minute to four minutes *before he can get up off the floor, wherever he's sitting at," not* that his seizures only lasted for one to four minutes. Ms. Akers does not contradict plaintiff's own testimony about how long after a seizure he would be "out of it," and in fact she indicates there is a significant recovery period accompanied by tremendous headaches and other after effects. R. 86–89. It would be unreasonable to expect plaintiff to be stop-watch precise in recounting the duration of his seizure spells, or to expect these lay people to clearly differentiate between the exact duration of the actual psychic motor disturbance and the duration of its aftereffects, as the ALJ seemed to require.

(2) The driver's license. The ALJ ascribes great import to his perception that plaintiff was lying when he stated Dr. Martin had taken away his *driver's license* on account of the seizure disorder, in light of Ms. Akers' testimony that "he never had one." R. 21. This credibility finding is, at best, disingenuous. Ms. Akers actually testified:

A: He's never had a license.

ALJ: He never had one?

A: No, *he had a permit,* and then they found out that he wasn't allowed to have them. They told him—because *he was going to get his license,* and then they said *you're not allowed to have license while you're having seizures,* so we decided our son ought to get his, so at least somebody in our family had them.

R. 85 (emphasis added). Although plaintiff said "license" when it actually was a "license permit" that was taken away according to his wife, only an adjudicator whose mind was closed on this issue could conclude that Ms. Akers *contradicted* her husband. In fact her entire statement *strongly supported* plaintiff's testimony! Any "discrepancy" here is *de minimis.*

(3) The "shifting" last date of work. The ALJ seemed to find something nefarious in plaintiff's testimony about his last day at work, stating "the claimant kept changing the date he allegedly stopped working during the hearing when the undersigned pointed out inconsistencies in Exhibits regarding his work history." R. 17, 20. It is apparent that plaintiff, who suffers from bipolar disorder and other diagnosed mental impairments, was less than crystal clear and somewhat confused about his last day of work, but he explained his "inconsistent" answers to the "last day of work" questions because he had attempted to return to work on several occasions but was not able to. Although he initially was talking about his last day of regular, sustained work, later he was referring to his aborted attempts to return to work for a day or less. R. 69–70. Ms. Akers corroborated her husband's explanation and his attempts to return to work on several occasions. R. 89–90.

(4) ALJ's findings of plaintiffs so-called "wide variety of activities." The ALJ found plaintiff was "able to engage in a wide variety of activities including caring for his personal needs without assistance, watching television, playing with the children, helping his son build models, and visiting families frequently. (Exhibit 6)." Contrary to the ALJ's finding, the entire record, including plaintiff's and his wife's testimony, as well as medical histories and Dr. Kennedy's report, reveals a rather uneventful lifestyle, and a very *narrow* range of activities, including loss of interest in formerly satisfying activities such as watching the Steelers, hunting, and riding in a motorcycle club, not to mention difficulty sleeping, loss of appetite, and inability to drive. This Court does not doubt that what the ALJ characterizes as a "wide variety of activities" would be characterized by most people as relatively limited. As the Court of Appeals observed in *Smith v. Califano,* 637 F.2d 968, 971–72 (3d Cir.1981):

The ALJ seems to have relied heavily on the fact that claimant had testified that "he had full use of his hands, arms and legs, does shopping and last fall went hunting twice." App. at 124. Yet, *statutory disability does not mean that a claimant*

*must be a quadriplegic or an amputee.* Similarly, shopping for the necessities of life is not a negation of disability and even two sporadic occurrences such as hunting might indicate merely that the claimant was partially functional on two days. *Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.* Smith's activities are minuscule when compared to a plethora of cases which have held that there was total disability even when the claimant was far more active than Smith. *It is well established that sporadic or transitory activity does not disprove disability.*

(emphasis added).

### 3. Patently Defective Hypothetical Questions to Vocational Expert.

The vocational expert, Noel Plummer, Ph. D., had examined the plaintiff's medical records and was present throughout the hearing, and he responded to four hypothetical questions posed by the ALJ. The first asked the vocational expert to assume Dr. Kennedy's assessment at Exhibit 15 accurately set forth plaintiff's limitations and restrictions, and in that event, would he be able to perform his past work or any other work. R. 91–92. The vocational expert *unequivocally* answered "he would not be able to perform any other job on a sustained, repetitive basis based upon the limitations of that assumption." R. 92. Curiously, the ALJ found that Dr. Kennedy's evaluation was worthy of belief, R. 21, although ultimately he did not make a finding consistent with that belief.

. The second hypothetical asked the vocational expert to assume the limitations set forth in Dr. Hahn's report at Exhibit 20, which *confirmed* plaintiff's seizure disorder, but the ALJ added the extra assumptions that his seizures would last one to four minutes (as the ALJ interpreted Ms. Akers testimony), and that there would be *"no recovery period"* from the seizures. R. 92–93. As we have seen, Ms. Akers did not say his seizures lasted only one to four minutes, but that she would be able to get him up from the floor in that space of time after he had a seizure. More importantly, even though the vocational expert recognized the importance of knowing the recovery period after a seizure, the ALJ asked the vocational expert to assume a fact that is nowhere to be found on the record, namely that there is "no recovery period." It is a blatant mischaracterization of Ms. Akers testimony, at best, to assume no recovery period for her husband's seizures, and there certainly is nothing else on the record to even remotely support such an assumption. To the contrary, both the medical evidence and the testimony of plaintiff and his wife demonstrate there is a substantial recovery period accompanied by severe migraine headaches, and other "transient postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. Part 404, Subpt. P, § 11.03

Third, the ALJ "added" Dr. Mehta's assessment in Exhibit 16, including that plaintiff is "totally dysfunctional." The ALJ infers that "he talks about stress here." R. 93–94. Heaping his own assumption upon the ALJ's, the vocational expert opines that "well, of course, I must preface it with that stress is often a self-imposed kind of thing. . . . The primary factor in Exhibit 16 appears to be his assessment of the motivation of the claimant rather than any definitive limitation." R. 94. Based upon this *double assumption,* which negated Dr. Hahn's actual medical opinion that plaintiff is totally dysfunctional, the vocational expert opined that there were low to moderate stress jobs that plaintiff was capable of performing, and he listed some. R. 94.

Finally, asked to assume two seizures per week, with incapacitation for two hours thereafter, the vocational expert stated there would be no jobs that plaintiff could perform on any sustained basis. R. 95.

The vocational expert also indicated that "black outs" for one to four minutes would affect plaintiff's ability to perform a job, but with the caveat that such black outs would not prevent him from maintaining a job "if he could arrange to have his seizures on a regular basis." R. 96. Hopefully, that excerpt sounds worse on the "cold record" than it did at the hearing; the Court would like to believe the vocational expert was being face-

tious perhaps. In any event, there is nothing on the record that might arguably support the possibility plaintiff could "arrange to have his seizures on a regular basis."

Thus under two of the hypothetical scenarios, the vocational expert stated plaintiff would *not be able to work and the record supports these two hypothetical scenarios.* The other two scenarios, under which the vocational expert opined plaintiff could find and sustain work, were based on *wholly unfounded assumptions* of facts or medical opinions that have *no support in the record.* The patent deficiencies in these hypotheticals improperly influenced the ALJ's decision. *Podedworny v. Harris,* 745 F.2d 210 (3d Cir.1984); *Wallace v. Secretary of Health and Human Services,* 722 F.2d 1150, 1155 (3d Cir.1983). In *Podedworny* and *Wallace,* the ALJ had omitted one of the claimant's impairments from the hypothetical, and the Court of Appeals for the Third Circuit found, "the fact that these conditions were not included in the hypothetical question rendered that question defective, and thus the expert's answer cannot be considered substantial evidence." *Podedworny,* 745 F.2d at 218 (citing *Wallace,* 722 F.2d at 1155). The Court of Appeals further held: "[t]he insufficiency of the ALJ's proffered hypothetical question and the corresponding deficiency in the answer of the vocational expert would necessitate a remand to the Secretary for further proceedings." *Podedworny,* 745 F.2d at 219 (citing *Wallace,* 722 F.2d at 1155).

The ALJ must analyze all of the evidence in the record and provide an adequate explanation for disregarding evidence, *Brewster v. Heckler,* 786 F.2d 581, 584 (3d Cir.1986); *Cotter v.. Harris,* 642 F.2d 700 (3d Cir.1981); *Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3d Cir.1979), yet in his adjudication, the ALJ provided no explanation for discounting the "Dr. Kennedy hypothetical" which included Claimant's substantial nonexertional limitations as set forth in the very medical report the ALJ himself had credited. The vocational expert's response to the "Dr. Kennedy" question demonstrates that plaintiff was disabled as a result of a listed impairment, his bipolar condition and other mental impairments, as of December 4, 1992.

## VI. CONCLUSION

The Adjudication of the ALJ, as adopted by the Commissioner, is completely infested with misjudgment, mischaracterization of testimony, disregard of competent and largely uncontradicted medical evidence, and wholly lacks substantial evidence to support the denial of SSI benefits. Accordingly, the decision of the ALJ, as affirmed by the Commissioner, must be reversed, and this case remanded for an award and calculation of benefits.